UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| In re FIREFLY AEROSPACE INC. SECURITIES LITIGATION | § | No. 1:25-cv-01812-DAE |
| | § | CLASS ACTION |
| This Document Relates To: | § | **CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| ALL ACTIONS. | § | DEMAND FOR JURY TRIAL |

4900-4389-9824.v1

## TABLE OF CONTENTS

**Page**

GLOSSARY OF TERMS ........ iv

I. NATURE OF THE ACTION ........ 1

II. INTRODUCTION AND SUMMARY OF THE ACTION ........ 2

A. Flight Heritage ........ 2

B. Summary of the Allegations ........ 5

III. JURISDICTION AND VENUE ........ 9

IV. PARTIES ........ 10

A. Plaintiffs ........ 10

B. Defendants ........ 10

V. FACTUAL BACKGROUND ........ 15

A. Firefly Company Background ........ 15

B. Firefly's Struggles Leading up to the IPO ........ 18

VI. VIOLATIONS OF §11 OF THE SECURITIES ACT ........ 23

A. False and Misleading Statements in the Registration Statement ........ 23

B. Economic Loss ........ 31

VII. VIOLATIONS OF §10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 ........ 32

A. Firefly and the Executive Defendants' False and Misleading Statements During the Class Period ........ 32

B. Allegations of Firefly and the Executive Defendants' Scienter During the Class Period ........ 42

1. Admissions After the Class Period Show Scienter ........ 42

2. The Executive Defendants Were Involved in the Alpha Launch Vehicle Build ........ 43

3. The Executive Defendants Were Involved in the Alpha Strategy of Designing While Building ........ 44

4. Alpha Is Critical to Firefly's Core Operations ....................................... 45

5. The Executive Defendants Held Themselves Out to Investors as the Most Knowledgeable About the Relevant Issues ............................. 46

6. The Executive Defendants Were the Employees with the Most Authority over the Company's Public Statements .................................. 47

7. The Executive Defendants Had Motive and Opportunity to Commit Fraud ........................................................................ 47

C. Loss Causation and Economic Loss .................................................. 48

D. Applicability of the Presumption of Reliance and Fraud on the Market ............... 50

VIII. DISCLOSURES CONCERNING THE ALPHA LAUNCH VEHICLE .......................... 52

IX. NO SAFE HARBOR ........................................................................ 64

X. CONTROL ALLEGATIONS .................................................................. 65

A. The Signer Defendants' Control Over Firefly and the Registration Statement .................................................................................. 65

B. The Executive Defendants' Control Over Firefly During the Class Period .......... 66

C. The Controlling VC Defendants' Control Over Firefly ....................................... 67

D. The Controlling VC Defendants' Control Over their Representatives on Firefly's Board of Directors ........................................................... 70

XI. ALLEGATIONS OF *RESPONDEAT SUPERIOR* LIABILITY ................................ 71

XII. CLASS ACTION ALLEGATIONS ......................................................... 73

CLAIMS FOR RELIEF ........................................................................... 75

COUNT I: For Violation of §11 of the Securities Act (Against Firefly, the Signer Defendants, and the Underwriter Defendants) ................................................. 75

COUNT II: For Violation of §15 of the Securities Act (Against the Signer Defendants and the Controlling VC Defendants) ............................................ 77

COUNT III: For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Against Firefly and the Executive Defendants) ...................... 79

**Page**

COUNT IV: For Violation of §20(a) of the Exchange Act (Against the Executive Defendants and the Controlling VC Defendants) ....................80

PRAYER FOR RELIEF ....................81

JURY DEMAND ....................82

## GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| AFP | Automated fiber placement. A composite manufacturing technique used to fabricate complex advanced air vehicle structures that are lightweight with superior qualities. |
| Anomaly | A failed launch is referred to as an anomaly, and is an event that deviates from what is standard, normal, or expected during testing or operation. |
| Avionics | A launch vehicle's computers and electronic systems used for controlling and communicating, including the Command and Data Handling (C&DH) and Guidance, Navigation, and Control (GN&C) subsystems. |
| CAD | Computer-Aided Design. Dimensional drawings using 3D software to illustrate the final launch vehicle, its subsystems, and its components. |
| FAA | Federal Aviation Administration |
| Fairing | A launch vehicle's nose cone to protect the payload. |
| FFRDC | Federally Funded Research and Development Center |
| Flight heritage | A product whose design has previously undergone qualification and flown. |
| Flight proven | An identical unit which has been successfully operated or launched in identical configuration and environment. |
| Launch vehicle | A rocket designed to propel a payload into space. |
| LEO | Lower earth orbit. |
| LOX | Liquid oxygen. |
| Integration | The process of transforming the design into the desired end product through assembly and integration of lower-level validated end products. |
| Hydrocarbon contamination | Unintended fuel or other residual hydrocarbons within sensitive hardware, which can trigger combustion when interacting with oxidizers like LOX. |
| NCR | Nonconformance report. Report delineating the variance between the product and the specified requirements for the product. |
| NRO | National Reconnaissance Office, and an agency of the U.S. Department of Defense. Develops, acquires, launches, and operates space-based assets and ground systems. |
| Payload | An object being transported by a launch vehicle into space. |
| Reviewed and Release, or Release | Formal confirmation as part of quality control in manufacturing that authorizes production of a component that complies with its specified requirements. |

| Term | Definition |
| --- | --- |
| Roadshow | A series of presentations made by a company's executives and underwriters to pitch the company to prospective investors, shortly before the company's initial public offering. |
| RP-1 | Rocket Propellant-1. A highly refined, kerosene-based, hydrocarbon fuel used for rockets. |
| Space Force | The U.S. Space Force, a branch of the U.S. Armed Forces. |
| Stage | A section of the launch vehicle that contains its own engines and tanks. Alpha is a two stage launch vehicle, meaning that Stage 2 is stacked on top of Stage 1. During launch, Stage 1 separates when its propellant is expended. Stage 2 then ignites and continues. Finally, Stage 2 separates and the payload is deployed. |
| Tank | A cylindrical container, which can be pressurized or cryogenic, designed to store and deliver rocket propellants. Tanks constitute the vast majority of a launch vehicle's physical dimensions. |
| Test campaign | A comprehensive, phased series of tests designed to evaluate a product, including performance, efficiency, and durability. |
| TRL | Technology Readiness Levels. Nine levels developed by NASA to define the maturity of technologies. |
| Qualification | Qualification activities are performed to ensure that the flight unit design will meet functional and performance requirements in anticipated environmental conditions. Qualification is performed once regardless of how many flight units may be generated (as long as the design does not change). |
| Qualification test | Test or series of tests to prove qualification. |

## I. NATURE OF THE ACTION

Co-Lead Plaintiffs Julian Petroulas ("Petroulas") and Prakash Vasudeva Bhat ("Bhat") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included a review and investigation of U.S. Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, media coverage, former employees, industry and government reports, and other public information concerning or related to Firefly Aerospace Inc. ("Firefly" or the "Company"). Counsel's investigation of the facts underlying this action continues, and counsel further believes that other relevant facts are known only by defendants or are exclusively within their possession, custody, or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

This is a securities class action on behalf of all persons who purchased Firefly common stock on August 6, 2025 through and including September 29, 2025 (the "Class Period") and were damaged thereby (the "Class" or "Class Member(s)"), including those who purchased Firefly common stock traceable to the Company's Registration Statement used in connection with Firefly's initial public offering ("IPO").[1]

Plaintiffs assert strict liability claims for violations of §11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77k, against Firefly, its directors, including those who became

---

[1] "Registration Statement" refers to Firefly's registration statement, including the prospectus that formed a part of the registration statement, filed with the SEC on Form S-1 on July 11, 2025, as amended with the SEC on July 28, 2025 and August 4, 2025, and made effective as of August 6, 2025, and the prospectus dated August 6, 2025 filed with the SEC on Form 424(b)(4) on August 8, 2025, and includes any amendment, report, document, or memorandum filed as part of or incorporated by reference in such documents.

directors at the IPO, certain executives, and the IPO underwriters. Plaintiffs separately assert claims for violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Firefly and certain of its top executives, who are alleged to have made false and misleading statements during the Class Period. In addition, Plaintiffs assert control person claims under §15 of the Securities Act (15 U.S.C. §77o) and §20(a) of the Exchange Act (15 U.S.C. §78t(a)), as more specifically alleged below, against Firefly, its directors, certain officers, and AE Industrial Partners, LP ("AE Industrial"), including its funds and affiliates, based on their control of Firefly and control over certain members of Firefly's board of directors ("Board").

## II. INTRODUCTION AND SUMMARY OF THE ACTION

1. This action arises from misrepresentations and omissions made in connection with and after Firefly's August 2025 IPO. Firefly is a space and defense technology company, headquartered in Cedar Park, Texas. Its flagship product at the center of this action is Alpha, a two-stage, small-lift rocket designed to bring one-ton payloads into space.

### A. Flight Heritage

2. Central to the allegations in this complaint is the term "flight heritage," which was used throughout the Registration Statement and by Firefly's executives during the Class Period, and is a ubiquitous concept in the space industry that denotes reliability.

3. "Flight heritage" refers to the launch vehicle, its subsystems, and its components all having a track record of successful flights in space. For example, the Aerospace Corporation, an FFRDC that works closely with the U.S. Space Force ("Space Force") and the National

Reconnaissance Office ("NRO"), defines heritage as "[a] product whose design has previously undergone qualification and flown."[2]

4. Flight heritage is regularly referred to in a specific framework known as Technology Readiness Levels (TRL). In the 1970s, the National Aeronautics and Space Administration ("NASA") developed the nine TRL used to define the maturity of technologies that is now commonly used across the space industry, including both private business and government. The U.S. Department of Defense, for example, states that all critical technology should undergo TRL assessments, and reassessments of TRL as a result of any system design changes or new knowledge obtained during the engineering and manufacturing phases.[3]

5. Flight heritage is equivalent to being "flight proven," which is TRL 9, the top level: "***Actual system 'flight proven' through successful mission operations***."[4] A launch vehicle is understood to have flight heritage only after the "actual system" has been successfully used in a prior mission; the new vehicle must be in the same configuration as the previously successfully launched vehicle.[5] Flight heritage cannot apply to a launch vehicle if its design, materials, or manufacturing

---

2 Tzvetan S. Metodi, *Space Vehicle Testbeds and Simulators Taxonomy and Development Guide*, Aerospace Report No. TOR-2010(8591)-16 at 7 (June 30, 2010).

3 *See* Office of Systems Engineering and Architecture and Office of the Under Secretary of Defense for Research and Engineering, *Engineering of Defense Systems Guidebook*, §3.7.5 (2022) (amended October 2024).

4 NASA, *NASA Systems Engineering Handbook*, Appendix G at 211-212 (2016).

5 The other levels are: TRL 8: "Actual system completed and 'flight qualified' through test and demonstration (ground or flight)"; TRL 7: "System prototype demonstration in a target/space environment"; TRL 6: "System/subsystem model or prototype demonstration in a relevant environment (ground or space)"; TRL 5: "Component and/or breadboard validation in relevant environment"; TRL 4: "Component and/or breadboard validation in laboratory environment"; TRL 3: "Analytical and experimental critical function and/or characteristic proof-of-concept"; and TRL 2: "Technology concept and/or application formulated"; TRL 1: "Basic principles observed and reported." *See id.*

processes have been altered from the prior, successfully flown launch vehicle. A subsystem or component of the launch vehicle can have flight heritage, but in order to meet that standard, it too must be identical and flown in the exact same configuration. As the NASA Systems Engineering Handbook explains, a unit can only be assigned TRL 9 if the answer is yes to the following question: "Has an ***identical unit*** been successfully operated/launched in ***identical configuration***/environment?"[6]

6. Because space and rocketry are demanding, suppliers, buyers, engineers, manufacturers, and investors alike understand that reliability is only shown with flight heritage. As Dr. Scott Pace, the Director of the Space Policy Institute and a Professor of the Practice of International Affairs at George Washington University, explained when he testified in front of the Senate:

> A launch vehicle may be designed to be reliable, and the tools of probabilistic risk assessments can help predict relative reliabilities among different designs. ***But it is only with accumulated flight experience over time that one can actually know what the reliability of a vehicle is***. This is a challenge for developing vehicles in which the configuration of the vehicle may be changing from flight to flight. ***The actual flight heritage and confidence of individual subsystems, such as engines, electrical, guidance, and separation devices, can vary substantially in a vehicle that appears outwardly unchanged***.[7]

7. Thus, claiming a launch vehicle has flight heritage is the gold standard. It represents a demonstrated ability to deliver a reliable, high-quality vehicle. The reliability of the launch vehicle is proven because an identical launch vehicle in an identical configuration has been successfully operated under the actual conditions of space.

---

6 *Id.* at 212.

7 Hearing of the Senate Committee on Defense Appropriations, *National Security Space Launch Programs*, Testimony of Dr. Scott Pace at 5-6 (Mar. 5 2014).

## B. Summary of the Allegations

8. On August 6, 2025, Firefly's Registration Statement became effective, registering over 2.2 million shares of common stock for sale to public investors and allowing the Company to raise over $998 million in its IPO. But the Registration Statement filed and distributed to investors contained multiple false and misleading statements about Firefly's flagship product, Alpha.

9. The Alpha launch vehicle is a two-stage, small-lift rocket, designed to bring one-ton payloads into lower earth orbit (LEO). Undisclosed in the Registration Statement was that four out of Alpha's six launch attempts were total or partial failures. Instead, the Registration Statement falsely and misleadingly claimed that the Alpha launch vehicle had "***proven flight heritage***," was "***operational***," "***reliable***," and the only "***orbit-ready***" vehicle in its class. The Registration Statement even misleadingly claimed that Firefly had the ability to launch Alpha with an approximately "***24-hour turnaround***." It also contained false and misleading statements about Alpha's manufacturing processes, claiming that Firefly's processes were able to "***manufacture one Alpha launch vehicle per month***," with "***sophisticated and rigorous design, manufacturing, and testing processes and practices***." But as was disclosed after the Class Period, none of this was accurate, and these false and misleading statements in the Registration Statement are actionable under §11 of the Securities Act.

10. Plaintiffs also allege claims under §10(b) of the Exchange Act and SEC Rule 10b-5 for false and misleading statements made to investors after the Registration Statement became effective, by Firefly and its CEO, CFO, and Alpha's Chief Engineer. During the Class Period, Firefly and these executives repeated that the Alpha launch vehicle had "***flight heritage***," was a "***flight-proven vehicle***," and was "***tried and true***." They also claimed that Firefly had "***a production line of Alpha rockets***," and when asked by investors about any design changes, which were in fact continually ongoing, they falsely claimed there was "***no change to the design***."

11. To bolster these false and misleading claims, at Firefly's first earnings call the CEO directed investors to a presentation showing Alpha Flight 8 being built, and claimed it was "in a mature state." But it was not, Flight 8 was based on a new design that had never even passed qualification testing. These executives are alleged to have been intimately involved in the design and manufacturing of Alpha, and their Class Period statements are alleged to be made with a strong inference of scienter.

12. On September 29, 2025, Firefly had a massive accident. While not during a launch and only from a ground test in a stand, video footage captured a truly colossal explosion, a fireball shooting hundreds of feet into the air.



13. The accident resulted in the loss of the entire Stage 1 for Flight 7, Alpha's next flight. That evening Firefly was forced to disclose that it still needed to test "***each critical component, engine, and vehicle stage***" and that Firefly was still "***learn[ing] from each test to improve our designs and build a more reliable system***." These disclosures revealed that Firefly was still testing and changing Alpha's design, meaning Alpha had no flight heritage, was not operational, and was in fact still in development. As one stock analyst observed the day after the accident, "this explosion of



4900-4389-9824.v1

Stage 1 during ground testing highlights the technical risk that remains with the company that is ***still early in the technology curve***."

14. Firefly would later make additional admissions showing that it lacked key processes, inspections, controls, and other basic requirements needed to reliably build Alpha. Firefly acknowledged that it needed to change its quality culture, start using industry best practices, and proceeded to implement training and hold regular exercises covering the new procedures for "sustained process enhancements." Stock analysts reacted by cutting their valuations in half and stating that Firefly needed to prove Alpha could credibly fly.

15. Based on these events and disclosures, and less than two months after the IPO, the price of Firefly's stock would fall to $16.92 per share – a massive 62% drop from its $45 per share IPO price.

16. The extent of the false and misleading statements, however, would be confirmed over the next several months. On January 13, 2026, Firefly announced an extensive reconfiguration to Alpha, called "Block II," which it acknowledged was based on all "***six Alpha launches and hundreds of hardware tests***." The new configuration included lengthening the entire structure of the vehicle, changes to both stages, material and manufacturing changes to all carbon composite structures, and bringing the batteries and avionics (all the computers and electrical systems) in-house.




17. Firefly disclosed that it had actually planned Block II all along as part of its strategic plan, and that Flight 8, which the CEO had described as being in a "mature state," would in fact be the first flight under the new configuration. And far from being "mature," Block II had ***not even passed qualification testing***. Not only did the changes significantly conflict with the claims of "no change to the design," the changes all corrected Alpha issues which existed and were known to the executives prior to the Class Period but were hidden from investors. Firefly also acknowledged that as part of its strategic plan, the then-existing Alpha rocket would be decommissioned with its next flight, Flight 7. And Firefly now acknowledged that Flight 7 was only a "***test flight***" and flying multiple subsystems "***to gain flight heritage***."

18. Finally, on March 11, 2026, seven months after the Registration Statement claimed Alpha was ready to launch, even in 24 hours' notice, with customers lining up for its operational rocket, Firefly tested its next demonstration flight, flying a dummy payload. In the YouTube video covering the flight, Firefly made yet another admission. Firefly acknowledged that Alpha's four fuel tanks – which other than the engines are the most critical components of a rocket – had in fact never been successfully flown, and only one had even been attempted, in the failed Flight 6. This specific

admission confirmed just how significant the design changes were that Firefly failed to previously acknowledge. Alpha simply did not have flight heritage like the Registration Statement and Firefly's executives claimed.

19. These post-Class Period events and admissions revealed the undisclosed fact that Alpha was an unproven, unreliable rocket. Firefly has never been profitable, and at the time of the IPO it had an accumulated deficit totaling approximately $917 million. But with the IPO, Firefly collected $998 million and the executives reaped hundreds of millions of dollars in stock awards. As for investors, they were severely harmed because of the false and misleading statements in the Registration Statement and those made by the CEO, CFO, and Alpha's Chief Engineer.

20. Alpha is still not operational or reliable. At the time of filing this consolidated complaint, Block II has still not passed qualification testing.

## III. JURISDICTION AND VENUE

21. The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o), as well as §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act (15 U.S.C. §77(v)), and §27 of the Exchange Act (15 U.S.C. §78aa).

23. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), §22 of the Securities Act (15 U.S.C. §77(v)), and §27 of the Exchange Act (15 U.S.C. §78aa), as Firefly is headquartered and conducts substantial business in this District.

24. In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Plaintiffs

25. Co-Lead Plaintiff Julian Petroulas purchased 159,402 shares of Firefly common stock traceable to the Registration Statement, as well as during the Class Period, as set forth in his certification previously filed with the Court. ECF 19-2.

26. Co-Lead Plaintiff Prakash Vasudeva Bhat purchased 8,000 shares of Firefly common stock traceable to the Registration Statement, as well as during the Class Period, as set forth in his certification previously filed with the Court. ECF 18-3.

### B. Defendants

#### 1. Company Defendant

27. Defendant Firefly Aerospace Inc. is a Delaware corporation with principal executive offices located at 1320 Arrow Point Drive #109, Cedar Park, Texas 78613. The Company's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "FLY."

#### 2. Executive Defendants

28. Defendant Jason Kim ("Kim") served as Firefly's Chief Executive Officer and director at all relevant times. Defendant Kim signed or authorized the signing of the Registration Statement, and made false and misleading statements during the Class Period as alleged herein.

29. Defendant Darren Ma ("Ma") served as Firefly's Chief Financial Officer at all relevant times. Defendant Ma signed or authorized the signing of the Registration Statement, and made false and misleading statements during the Class Period as alleged herein.

30. Defendant Jordi Padres Garcia ("Garcia") served as Alpha's Chief Engineer at all relevant times. Defendant Garcia made and authorized false and misleading statements during the Class Period as alleged herein.

31. Defendants Kim, Ma, and Garcia are collectively referred to herein as the "Executive Defendants."

**3. Signer Defendants**

32. Defendant Christopher Emerson ("Emerson") served as a director on Firefly's Board at all relevant times and signed or authorized the signing of the Registration Statement. Emerson also sat on the Nominating and Corporate Governance Committee of the Board and is a Senior Partner at AE Industrial.

33. Defendant Kirk Konert ("Konert") served as Chairman of Firefly's Board at all relevant times and signed or authorized the signing of the Registration Statement. Konert also sat on the Audit Committee of the Board and is the chair of the Compensation Committee of the Board. Konert is a Managing Partner at AE Industrial.

34. Defendant Thomas Markusic ("Markusic") served as a director on Firefly's Board until the completion of the IPO and signed or authorized the signing of the Registration Statement.

35. Defendant Jed McCaleb ("McCaleb") served as a director on Firefly's Board until the completion of the IPO and signed or authorized the signing of the Registration Statement.

36. Defendant Marc Weiser ("Weiser") served as a director on Firefly's Board at all relevant times and signed or authorized the signing of the Registration Statement.

37. Defendant Remington Wu ("Wu") served as Firefly's Chief Accounting Officer at all relevant times and signed or authorized the signing of the Registration Statement.

38. Defendant Thomas Zurbuchen ("Zurbuchen") served as a director on Firefly's Board at all relevant times and signed or authorized the signing of the Registration Statement.

39. Defendant Ryan Boland ("Boland") served as a director on Firefly's Board since the completion of the IPO and consented in the Registration Statement to being named as about to become a director.

40. Defendant Pamela Braden ("Braden") served as a director on Firefly's Board prior to October 2024, was reappointed at the completion of the IPO, and consented in the Registration Statement to being named as about to become a director. Braden also sat on the Audit Committee of the Board and is an Operating Partner at AE Industrial.

41. Defendant Jon Lusczakoski ("Lusczakoski") served as a director on Firefly's Board since the completion of the IPO and consented in the Registration Statement to being named as about to become a director. Lusczakoski was also the chair of the Compensation Committee of the Board and is a Partner at AE Industrial.

42. Defendant Kevin McAllister ("McAllister") served as a director on Firefly's Board since the completion of the IPO and consented in the Registration Statement to being named as about to become a director. McAllister was also the chair of the Nominating and Governance Committee of the Board and is a Senior Operating Partner at AE Industrial.

43. Defendants Kim, Ma, Emerson, Konert, Markusic, McCaleb, Weiser, Wu, Zurbuchen, Boland, Braden, McAllister, and Lusczakoski are collectively referred to herein as the "Signer Defendants."

**4. Underwriter Defendants**

44. Defendants Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), Jefferies LLC ("Jefferies"), Wells Fargo Securities, LLC ("Wells Fargo"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Cantor Fitzgerald & Co. ("Cantor Fitzgerald"), Roth Capital Partners, LLC ("Roth Capital"), and Academy Securities, Inc. ("Academy Securities") acted as underwriters in Firefly's IPO. They are collectively referred to herein as the "Underwriter Defendants."

45. As underwriters of Firefly's IPO, the Underwriter Defendants:(i) participated in the drafting and/or dissemination of the Registration Statement; (ii) participated in the solicitation of

investors to purchase Firefly shares in the IPO; (iii) sold approximately 2.2 million shares of Firefly common stock at $45 per share, in connection with the IPO; (iv) were responsible for ensuring the completeness and accuracy of the statements contained in the Registration Statement; and (v) collectively received more than $57.4 million in connection therewith.

46. The Underwriter Defendants also collected additional fees, commissions/mark ups, and costs as participants in the market for Firefly stock after the IPO. Proceeds from the IPO were also to repay Firefly's $159.5 million outstanding loan, where an affiliate of Jefferies was a lender, and affiliates of Goldman Sachs, J.P. Morgan, and Wells Fargo entered into a commitment letter for a new $125 million lending agreement with Firefly that was to be completed shortly after IPO's closing. Goldman Sachs also served as exclusive financial advisor to Firefly in its acquisition of SciTec Inc. ("SciTec") shortly after the IPO. Thus, these Underwriter Defendants also received other fees, sources of income, and other benefits as a result of Firefly's IPO.

**5. Controlling Venture Capital Defendants**

47. Defendant AE Industrial Partners, LP is a Delaware limited partnership, with its principal office and place of business located at 6700 Broken Sound Parkway NW, Boca Raton, FL 33487. The Registration Statement acknowledged that "AE Industrial Partners controls us." AE Industrial is a large private investment firm that is a registered investment adviser and manages over $6 billion worth of client assets on a discretionary basis.

48. Defendants Michael Greene ("Greene") and David H. Rowe ("Rowe") founded, are co-CEOs and Managing Partners of, and at all relevant times, controlled AE Industrial.

49. Defendants Glow NS Holdings, LLC, Glow NS Intermediate Holdings, LLC, Glow Aggregator, LLC, Glow B Holdings, LLC, Glow C Holdings, LLC, Glow D Holdings, LLC, AE Industrial Partners Fund II, LP, AE Industrial Partners Fund II GP, LP, AE Industrial Partners Fund III, LP, AE Co-Investment Partners Fund III-F, LP, AE Industrial Partners Fund III GP, LP, AE

Industrial Partners Structured Solutions I, LP., AE Industrial Partners Structured Solutions I GP, LP, AeroEquity GP, LLC (collectively, the "AEI Funds") are AE Industrial's funds that invested in Firefly. These funds were created by AE Industrial, and AE Industrial maintains the authority over these funds and their investments, including to evaluate their portfolio companies (such as Firefly), negotiate the terms of investments, manage and monitor the portfolio companies, and achieve disposition of such investments. As AE Industrial states in its public filings to the SEC, each "GP" (*i.e*., general partner) of the AEI Funds above together with AE Industrial operates as a single advisory business, and thus they control the other AEI Funds (*i.e*., the limited partners and limited liability companies) and their Firefly investments.

50. AE Industrial, Greene, Rowe, and the AEI Funds are collectively referred to herein as the "Controlling VC Defendants."

51. At all relevant times as a result of their initial investment in 2022 and subsequent investments at private funding rounds, the Controlling VC Defendants controlled Firefly. Greene and Rowe controlled AE Industrial, and as controlling managing members of AeroEquity GP, LLC (the entity that controls AE Industrial and the AEI Funds), controlled the AEI Funds. They made the voting and investment decisions with respect to the investments held by AE Industrial and the AEI Funds, including Firefly. AE Industrial has contractual discretionary authority to manage investments on behalf of each AEI Fund, and thus with and through the AEI Funds also controlled Firefly. As more thoroughly discussed below, through their ownership of Firefly, the employees/agents they placed on Firefly's Board, and through their agreements amongst their legal entities and with Firefly, the Controlling VC Defendants effectuated their control over Firefly's IPO, the Registration Statement, and Firefly during the Class Period.

52. As venture capital investors, the Controlling VC Defendants' primary incentive is to harvest their earlier investments, which in Firefly's case was at least $254.2 million, excluding the initial securities AE Industrial purchased from Noosphere Ventures ("Noosphere") in 2022. The issue price of Noosphere's shares was approximately $184 million. In addition, upon completing the IPO, the Controlling VC Defendants' investments in Firefly were converted into 58,818,886 shares of beneficially owned common stock or over $2.6 billion at the IPO price of $45 per share. They also received millions in preferred share dividends and over $21 million in net proceeds from the IPO proceeds to repay a Firefly loan the Controlling VC Defendants acquired. AE Industrial receives from the AEI Funds a 2% management fee and 20% of realized profits, subject to 8% compound preferred return on the investments, which also flows through to Greene and Rowe, in addition to any of the Controlling VC Defendants' own capital invested into Firefly or the AEI Funds.

53. In addition, the Controlling VC Defendants also controlled five of the nine directors on Firefly's Board: Emerson, Konert, Braden, McAllister, and Lusczakoski (collectively, "Controlled Directors"). The Controlled Directors were also employees and/or agents of the Controlling VC Defendants, who as part of their scope of employment and/or agency sat on Firefly's board or performed similar functions, signed or authorized the signing of the Registration Statement, and/or consented to being named as about to become a Firefly director in the Registration Statement.

## V. FACTUAL BACKGROUND

### A. Firefly Company Background

54. Firefly is a space and defense technology company that provides space launch, transit, and operations services to national security, government, and commercial customers. Firefly's flagship product is a two-stage, small-lift rocket referred to as Alpha, which the Company claims is "the first and only U.S.-based orbital rocket in the 1,000 kilograms class." Its only other launch

vehicle, Eclipse, is purportedly a scaled-up and reusable version of Alpha, but is still in early development. At the time of the IPO, Firefly was organized into two divisions: (i) Launch, which built launch vehicles; and (ii) Space Solutions, which built satellites and other spacecraft deployed in space.

55. Firefly was founded in 2014 as Firefly Space Systems by defendant Markusic and a small group of entrepreneurs who self-funded the company. The initial Alpha design was revealed in July 2014. But in December 2014, Markusic's former employer, Virgin Galactic, alleged, among other things, that Markusic had misappropriated its trade secrets and confidential information concerning the Alpha development team. In 2016, after adverse legal proceedings, a major prospective investor backed out, leaving the company without funding, and by December 1, 2016, Firefly Space Systems ceased all engineering work and furloughed its staff.

56. In March 2017 the company was liquidated, and most of its assets were sold at auction to Noosphere, which re-created the company as Firefly Aerospace. The new management significantly altered plans for the design of Alpha. In particular, the revised Alpha design featured a very different engine and configuration, and was redesigned to be a much larger rocket, with twice as much capacity as the initial design.

57. On September 3, 2021, Firefly launched its first test flight of the revised Alpha rocket (Flight 1). However, 15 seconds after launch, one of the new Stage 1 Reaver engines shut down prematurely, leading to flight termination.

58. On February 24, 2022, AE Industrial announced that it had reached an agreement with Noosphere to acquire its stake in Firefly. AE Industrial took control of the Company, taking over the Board and replacing management. AE Industrial brought in a new CEO, replacing Markusic with Peter Schumacher, an AE Industrial employee, and then Bill Weber, and also put in a

new COO, Dan Fermon. AE Industrial sunk hundreds of millions of dollars into Firefly, at least $254.2 million (which does not include the amount paid to Noosphere), in various private financing rounds. While various minority follow-on investors also invested in Firefly, AE Industrial ensured through its corporate structure and contractual framework that Firefly was always under its complete control.

59. On October 1, 2022, Firefly launched its second test flight, Flight 2, which was also unsuccessful. While it initially ascended from the launch pad, Flight 2 failed to reach its targeted LEO. As a result, the payload of demonstration satellites re-entered the atmosphere and crashed into the Pacific Ocean.

60. In October 2022, however, the Space Force's Space Systems Command awarded a contract to Firefly to launch a Millennium Space Systems ("Millennium") satellite in its Victus Nox mission. As detailed below, defendants would later claim that the September 14, 2023 launch was conducted on 24 hours' notice. But it was not. For eight months before the launch, Millennium and Firefly, together, conducted multiple stress tests on processes, procedures and interfaces. Firefly also built a special payload processing facility specifically for the Victus Nox mission, separate from its own factory, where Millennium prepared their satellite and did the integration work with Firefly's payload fairing ahead of the launch.

61. In August 2023, the two companies conducted a complete dry run a month before launch, which included all the details of transportation and preparation of the vehicle (including fueling and integration with the payload fairing). The preparation also included packing and delivering a satellite mockup to Vandenberg Space Force Base ("Vandenberg") and practicing all launch operations.

62. On August 30, 2023, Millennium and Firefly entered into "hot standby," meaning Firefly was fully prepared at Vandenberg waiting for a notice to connect the Millennium satellite payload to the modified Alpha rocket and fuel the rocket. The companies received a 60-hour notice for an Activation Phase, which came on September 8, six days before the launch, after which the teams then transported the satellite, fueled the rocket, and attached the satellite to the specialized payload adaptor. When all these steps were complete, the 24-hour notification followed, which was simply the final notification with the orbit parameters. Only after all this warning and prior preparation, 15 days after Alpha went into "hot standby," did the launch occur 27 hours later.

63. Since the Victus Nox mission (Flight 3), Alpha has at best been inconsistent. Its next flight, Flight 4, ended in an anomaly, a failure to ignite in Stage 2, while its Flight 5, a demonstration flight for NASA, reached LEO. Firefly would take its lessons learned from these launches and Alpha would be continually modified, with design, manufacturing, and processes continually changing and undergoing hundreds of subsystem and component tests to qualify and validate the changes.

64. On August 29, 2024, Firefly announced that defendant Kim would be its new CEO. Defendant Kim was hired from Millennium and was involved in the Victus Nox mission, and contractually reported to the Chairman of the Board, defendant Konert, an AE Industrial employee.

### B. Firefly's Struggles Leading up to the IPO

65. As discussed above, as a private company Firefly struggled to reliably launch its flagship product, Alpha. Coming into 2025, three out of the first five Alpha launch attempts were total or partial failures, and Firefly was never profitable. As of December 31, 2024, the Company had incurred an accumulated deficit totaling approximately $767.6 million, which would balloon to $917 million prior to the IPO.

66. Dan Fermon, Firefly's COO, who reported to defendant Kim, was responsible for all manufacturing teams that were building the Alpha launch vehicle. The integration, test, and launch teams reported to Adam Oakes, Vice President of Launch Vehicles, who was part of the executive team and reported daily to defendant Kim. The integration team assembled Alpha, including wiring, tubing, engines, and computers, before delivering the launch vehicle to the test team. The test team would receive the stages, light the engines and test them before sending Alpha back to the integration team to run more tests and prepare the launch vehicle for shipping from the Briggs, Texas facility to Vandenberg. Members of the integration team would then also travel to Vandenberg to unload Alpha and do more tests before placing the rocket on the launch pad.

67. Firefly is a relatively small company with less than 800 employees at the time of the IPO (far fewer than AE Industrial's approximately 7,000). Its three primary locations: (i) headquarters; (ii) spacecraft facility; and (iii) manufacturing and testing site, are only 25 miles apart. Firefly's executives, including the Executive Defendants, were intricately involved in the Alpha builds, testing, and launches. The C-Suite would also visit the manufacturing and testing site, and Firefly had monthly all-hands meetings during which the C-Suite executives would discuss the Alpha builds and progress made.

68. Toward the end of an Alpha rocket build, approximately a month before the integration team would pass the Alpha launch vehicle over to the testing team, a daily email chain with updates on progress, issues, and obstacles was circulated to all Vice Presidents, including Adam Oakes and defendant Garcia. This communication began approximately two months before the launch vehicle was transferred to Vandenberg, and daily emails would continue to be circulated to executives once the Alpha rocket was at Vandenberg until launch.

69. Leading up to the IPO, the Alpha launch vehicle was plagued by inconsistencies in design and manufacturing. Alpha design changes in the middle of builds were constant. The building of each next Alpha rocket would begin before the solutions to past performance issues were designed and implemented, and even before the data from previously-identified test and launch issues were analyzed. Firefly's builds were not in accordance with the computer-aided design (CAD), which was housed on the Siemens NX system, meaning Firefly did not have accurate CAD drawings while building each Alpha.

70. The rush to build and refine Alpha was intentional, however, because waiting and testing a complete rocket took too long if Firefly wanted to take advantage of the burgeoning space transportation market. Thus, by designing as they built, and testing and retesting subsystems and components multiple times, Firefly could expedite the development process. In fact, the Company would change design, manufacturing, and integration processes in the middle of a build or between launches, and then test new or altered subsystems or components before they were built into a stage. While this iterative design process increased the speed of development, it also compromised the integrity of the rocket.

71. Firefly's mid-build design changes impacted downstream processes. Instead of working off "reviewed and release" instructions (Release), a quality control authorization showing that the build will be as the design specifies, the integration team was building Alpha based on "non-conformance reports" (NCR). Firefly also shortcut the typical approval processes. Signoffs for work instructions were often skipped, which should have required authorization from multiple parties consisting of four or five people. While the entire executive team was pushing for – and announcing to investors – six to twelve launches in two years, Firefly did not have the capability to produce six Alpha vehicles in a year. Firefly's processes were more akin to a startup, and as it

would later acknowledge, Firefly lacked key processes, inspections, and controls, and would later need to implement a reliability team to focus on a quality culture in order to provide an operational and reliable rocket.

72. By April 2025, Firefly's Flight 6 launch vehicle was nearly complete, its Flight 7 vehicle was approximately 50% complete, and its Flight 8 was planned but the Company was waiting on parts and materials. Prior to the launch of Flight 6, Firefly realized that under the current Alpha design, the rocket was running out of liquid oxygen (LOX) before running out of rocket propellant. Lengthening the structure and the tanks would allow Alpha to get more thrust and a longer burn time from the main engines, allowing a full burn of both LOX and propellant, and enabling Alpha to reach a higher flight trajectory. But Firefly determined that it would push forward with Flight 6 without these changes.

73. With funds from its private financings rapidly depleting, Firefly had an ever-increasing need to raise cash to cover its expensive launch vehicle development. It desperately needed to get Alpha on track in the anticipated high-frequency commercial and defense-space-payload business. With this pressing need for cash, Firefly sought to capitalize on the burst of positive publicity from the successful landing of its Blue Ghost spacecraft out of its separate Space Solutions division to raise money through an initial public offering. Thus, on April 16, 2025, Firefly confidentially filed with the SEC a registration statement to bring the Company public.

74. On April 29, 2025, however, Firefly experienced another anomaly while launching its sixth flight. Flight 6 was the first rocket for which Firefly had used its automated fiber placement technology (AFP) for Alpha's Stage 2 LOX tank, while three other Alpha tanks did not use the AFP design and manufacturing process. The launch failed when Alpha broke apart milliseconds after the Stage 1 separation, which destroyed the Stage 2 engine nozzle extension, reducing thrust. Stage 2

ran out of propellant and both Stages fell into the Pacific Ocean. Subsequent investigations attributed the mishap to Alpha's exhaust disrupting airflow around the vehicle, and a resultant inability to withstand intense heat. The FAA grounded Alpha until Firefly could show that its launches would "not affect public safety."

75. Firefly nonetheless pressed forward with its IPO plans, making its first public filing of its Registration Statement on July 11, 2025. But the initial public Registration Statement did not mention the Flight 6 anomaly at all. And on July 23, 2025, the SEC confidentially wrote to Firefly and reminded that "the company and its management are responsible for the accuracy and adequacy of their disclosures," asking Firefly to: "Please update your disclosures to disclose this launch failure, impact of the launch failure on your business and any updates on the FAA investigation." The Company was forced to make some minimal disclosures about the Flight 6 failure, but as alleged below, its disclosure was materially incomplete and misleading.

76. On July 28, 2025, in advance of the IPO, Firefly began its roadshow to become a public company, during which time the executives pitched the Company to potential investors. Defendant Kim, as Firefly's primary pitchman, set the context for the statements in the Registration Statement that would be conveyed to the investing public.

77. The July 28, 2025 roadshow presentation explained that there were two products Firefly had that it claimed were "Operational" – the Blue Ghost lunar lander and Alpha. Firefly claimed in its presentation that it was the "First & Only U.S. Based Company with an Operational Rocket to LEO in the 1,000kg Category." Alpha was presented as Firefly's main product, accounting for $472 million out of the $883 million of disclosed backlog (the revenue investors were told to expect from purportedly already signed contracts).

78. The presentation also primed investors to expect three Alpha launches in the remaining second half of 2025, at about $15 million in revenue per launch, with an additional three launches in 2026. The Company gave the specifics for the purported 2025 Alpha launch cadence: (i) the next launch, Flight 7, would carry a military Tactical Satellite for Lockheed Martin Corp. ("Lockheed Martin"); after that (ii) a launch for True Anomaly carrying a Jackal LEO satellite; and (iii) an additional launch for Lockheed Martin as part of Firefly's "Multi-Launch Agreement."

## VI. VIOLATIONS OF §11 OF THE SECURITIES ACT

### A. False and Misleading Statements in the Registration Statement

79. On August 6, 2025, Firefly's Registration Statement became effective, registering 22.2 million shares of Firefly's common stock for sale to the public. But it contained multiple untrue statements of material fact and omitted material facts necessary to make the statements made therein not misleading.

80. The Registration Statement falsely and misleadingly claimed that the Alpha rocket had flight heritage, repeating each of the following statements multiple times:

> Our rapid response capabilities are essential to the NRO's defensive missions, providing them with a launch vehicle with leading capabilities and ***proven flight heritage***.
>
> * * *
>
> We have a differentiated and scalable platform of Launch and Spacecraft Solutions ***with flight heritage***.
>
> * * *
>
> ***Our heritage and proven technology are resetting the standard for success in launch***, lander, and space markets. Our Alpha launch vehicle is the only orbit-ready U.S. rocket in the 1,000 kilograms payload vehicle class.

81. The Registration Statement falsely and misleadingly stated that the Alpha rocket had four launches completed successfully, when at best only two launches could be considered

successful: "Our operational launch vehicle, Alpha, is the first and only U.S.-based orbital rocket in the 1,000 kilograms class to successfully reach orbit, with ***four launches completed successfully***."[8]

82. The Registration Statement also falsely and misleadingly called Alpha's Flight 2 a success but, in fact, Flight 2 failed to reach its targeted LEO: "***The successful FLTA002 mission using Alpha made us the first U.S. company to achieve orbit on its second attempt***."

83. The Registration Statement then falsely and misleadingly claimed that the Alpha rocket was operational and was the only one ton U.S. rocket ready to fly, repeating the following statements multiple times:

> ***Our operational launch vehicle, Alpha***, is the first and only U.S.-based orbital rocket in the 1,000 kilograms class to successfully reach orbit, with four launches completed successfully.
>
> * * *
>
> Our Alpha launch vehicle is the only ***orbit-ready*** U.S. rocket in the 1,000 kilograms payload vehicle class.
>
> * * *
>
> We began operations in 2017 and successfully reached orbit with Alpha in October 2022, after extensive research, development, and testing. This achievement made us the first and ***only U.S. commercial company with a rocket ready to fulfill critical space missions*** in the 1,000 kilograms payload class.

---

8 The Registration Statement never disclosed the success or failure of all of Firefly's launches, and called disclosed flights by their code mission name (except for Flight 2), masking the sequence of successful and failed launches. Prior to the Registration Statement being filed, Alpha had six launches. Flight 1 was a total failure. Flight 2 failed to reach its targeted LEO, with the payload re-entering Earth's atmosphere. Flight 3 was purportedly successfully launched. Flight 4 also failed to deliver the payload to its target orbit when its Stage 2 failed to relight. Flight 5 purportedly was a success. The most recent launch prior to the IPO, Flight 6, was a total failure. Thus, Firefly had two launches completed successfully, two total failures, and two partial failures.

84. The front of the Registration Statement included this false and misleading graphic, misleadingly impressing on investors that Alpha was reliable, and as discussed below, responsive:




85. Inside, the Registration Statement falsely and misleadingly claimed that the Alpha rocket was currently reliable, which gave Firefly an edge over the competition, repeating each of the following statements multiple times:

> As one of the only U.S.-based commercial companies ***currently equipped to provide reliable access to launch***, transit, and operations in space, we are leading the way in end-to-end services for the rapidly expanding defense, space exploration, and commercial space markets.

* * *

> As one of the only U.S.-based commercial companies ***currently equipped to provide reliable access to launch***, transit, and operations in space, we are poised to grow in this attractive market.
>
> *    *    *
>
> Our products are designed to address our customers' space and defense technology needs. ***Within Launch, we provide satellite customers with reliable, regular, and rapid access to space***.

86. Each of the statements set forth above in the Registration Statement (¶¶80-85) were materially false and misleading because:

(a) Alpha did not have four launches completed successfully, and Flight 2 was a partial failure, failing to reach the targeted orbit;

(b) The Alpha launch vehicle did not have flight heritage, was not proven, and could not be claimed to be reliable. Firefly would disclose later that Alpha's four AFP tanks, among the most critical components of a rocket, had never been successfully flown. Alpha's CAD was constantly changing as part of its iterative design strategy, and constant design changes also meant constant manufacturing and integration changes as well. Firefly was constantly adapting and making changes after launches and tests, which meant it could not claim flight heritage on its then-current Alpha rocket;

(c) The Alpha launch vehicle was not operational, ready, or reliable. Later events and disclosures confirmed that Alpha was still in development and undergoing tests, and based on those results, Firefly was altering its design and trying to build a more reliable system; and

(d) The then-current Alpha launch vehicle was planned to be decommissioned. Part of Firefly's strategic growth plan was to have Alpha undergo a new reconfiguration. Undisclosed to investors, Firefly had been working on significant and long-planned design changes with its "Block II", which was already being implemented, to correct identified issues with the current Alpha. However, Block II had not even completed qualification testing, and the next flights

were already being built using these unqualified subsystems and components. Failing to disclose to investors that the current Alpha rocket would be decommissioned and replaced by an unqualified prototype made the claims of having a responsive, reliable, operational rocket with flight heritage – ready for the demand Firefly was purportedly seeing – materially misleading.

87. The Registration Statement also portrayed Alpha to investors as a "responsive launch for national security, government, and commercial customers." A responsive launch vehicle is designed to place small satellites or payloads into orbit on short notice, typically within days or hours, rather than months. As a proof-point for Alpha's response launch capabilities, the Registration Statement falsely and misleadingly referred multiple times to Firefly's Victus Nox mission. It claimed that Alpha launched Victus Nox within 24 hours, but in reality it was a special build that took eight months and Alpha went into "hot standby" 15 days before the launch:

> We are a leader in tactically responsive space missions, ***having completed a record-breaking launch with an approximately 24-hour turnaround for VICTUS NOX. This mission showcased our ability to deliver payloads to orbit on short notice***, which is a critical capability for national security operations. . . . ***With these proven launch capabilities*** and innovative technologies, we are a crucial partner for large national defense primes who need access to space.

88. In addition to the reasons stated in ¶86, the statements above in the Registration Statement (¶87) were materially false and misleading because:

(a) The Registration Statement did not disclose the eight months it took to prepare Alpha for the Victus Nox specialized launch. Nor did it disclose the actual circumstances of the launch which was misleading. Further, the Registration Statement failed to disclose that Victus Nox was Flight 3, and that there were two failures that occurred after Victus Nox (Flight 4: December 22, 2023 failure to ignite in Stage 2, and Flight 6: April 29, 2025 Stage 1 anomaly). Thus, the Registration Statement could not accurately and truthfully state that Alpha had "proven launch capabilities" based on Flight 3; and

(b) The Registration Statement conveyed to investors the misleading impression that Alpha could be launched on 24 hours' notice, but in fact, as would also later be disclosed, Alpha was in development, needing tests for each critical component before each launch. Further, the current Alpha was planned to be decommissioned and replaced by an unqualified prototype and therefore Alpha did not have the operational, reliable, and responsive capabilities as claimed in the Registration Statement.

89. The Registration Statement also claimed that Firefly had "processes to manufacture one Alpha launch vehicle per month" but falsely and misleadingly claimed to have a reliability-first approach to building and adhering to the highest standards, which was also a purported differentiator for the Company:

> To meet this growing demand and accelerate production, we doubled our production facility size to approximately 200,000 square feet and ***expanded our processes to manufacture one Alpha launch vehicle per month***.
>
> * * *
>
> The scarcity of launch capacity and increasing government and commercial demand has led these customers to seek out defense technology companies with cost-efficient and ***proven production systems for increasing capacity***.
>
> * * *
>
> ***We have taken reliability-first approach to building our launch vehicles***, landers, and spacecraft. We successfully built the world's largest all-composite launch vehicle, our Alpha rocket.
>
> * * *
>
> We strategically deployed capital to build state-of-the-art infrastructure ***to design, produce, test, and manufacture our products to the highest standard at a regular cadence***.
>
> * * *
>
> ***Our current manufacturing capability supports R&D, rapid prototyping, and flight level hardware in an integrated and disciplined manner, applying the correct level of rigor to the appropriate process***.

90. The Registration Statement also contained certain misleading "Risk Factors" detailing risks that ***could*** occur ***if*** certain events occurred. It misleadingly stated that Firefly's business would suffer ***if*** it was unable to manufacture its launch vehicles in a "quality that our customers demand," or that Firefly could not assure accidents would not occur even though it employed "sophisticated and rigorous design, manufacturing, and testing processes and practices." But it failed to disclose that Firefly did not have these standards and practices in place to begin with. Only ***after*** the September 2025 failure was Firefly forced to admit that it in fact lacked key processes, necessary inspections, proper training, and a quality culture:

> ***[I]f we are unable to manufacture our launch vehicles, landers, or orbital vehicles at a quantity and quality that our customers demand, our ability to grow our business may suffer***.
>
> . . . Even if we succeed in developing launch vehicles, landers, and orbital vehicles or producing these and other products consistent with our targeted timelines and customers' expectations, ***we could thereafter fail to develop the ability to produce these products*** or provide the corresponding cislunar services at a sufficient volume ***with a quality management system that ensures each unit performs as required***. . . . ***If our current or future launch services do not meet expected performance or quality standards***, including with respect to customer safety and satisfaction, we could experience operational delays**.**
>
> * * *
>
> ***The sophisticated and rigorous design, manufacturing, and testing processes and practices we employ*** do not entirely prevent the risk that we may not be able to successfully launch or manufacture our products on schedule or that our products may not perform as intended, whether due to reasons attributable to us or third parties (such as technical limitations of customer payloads or our suppliers' launch vehicles).

91. In addition to the reasons stated in ¶¶86, 88, statements set forth above in the Registration Statement (¶¶89-90) were materially false and misleading because Firefly did not have a proven, reliability-first, disciplined or rigorous process necessary to build Alpha, much less one a month. Firefly would disclose later, among other things, that it lacked key processes, inspections, controls, training, and a dedicated reliability team in order to successfully launch Alpha. Firefly was

building Alpha based on NCRs, processes were rushed, and sign offs were bypassed; Firefly was compromising reliability for speed-to-market. Indeed, Firefly's strategy was to test separate subsystems and components multiple times and make changes along the way in order to speed up the development of Alpha. All the mid-build design changes were impacting the manufacturing and integration processes, which in turn affected the integrity of the rocket. Firefly's processes were simply not able to reliably manufacture Alpha much less do so at a regular cadence.

92. The Registration Statement misleading claimed that Alpha was built using tanks made with AFP, but those had never been successfully flown:[9]

> ***Our rockets are built using lightweight and strong carbon fiber, leveraging automated fiber placement technology to ensure unified production methodology across all of our product lines***.
>
> * * *
>
> Alpha, Eclipse, Blue Ghost, and Elytra share common technologies, processes, team expertise, and production lines, enabling capital efficiency as well as first time quality across products. ***All products utilize the carbon composite primary and tank structures and leverage the automated fiber placement machine, power milling tool***, and other test capabilities.

93. In addition to the reasons stated in ¶¶86, 88, 91, statements set forth above in the Registration Statement (¶92) were materially false and misleading because out of Alpha's four tank structures, the two Stage 1 AFP tanks had never been flown, and only one of the two Stage 2 AFP tanks was attempted to be flown but was a failure, the Flight 6 anomaly. Thus, claiming that the Alpha tank structures were built leveraging AFP (and elsewhere in the Registration Statement that

---

9 Using AFP results in a lighter weight with greater strength than metals. Prior to the AFP machine being used, Firefly would need to use the "hand layup" method, which is a manual method of creating carbon fiber parts by layering fabric into a mold and coating it with resin. Prior to the IPO Firefly stated: "Once up and running at capacity, Firefly's AFP system will fabricate all carbon-fiber structures of an Alpha rocket, including barrels, fairings, domes, and payload components, in as little as fourteen days."

Alpha had "proven flight heritage"), without disclosing that Alpha's AFP tanks had never been successfully flown, was materially misleading.

94. As noted above, the SEC made Firefly disclose to investors the anomaly that occurred prior to the IPO during Flight 6. But the disclosure itself was misleading because by only stating that Firefly was waiting for FAA approval, the Registration Statement misled investors by omitting that design changes had been made in Flight 6 and that design changes addressing the issues that caused the Flight 6 failure were already being implemented in upcoming flights:

> On April 29, 2025 an anomaly occurred during our Alpha mission that launched from Vandenberg Space Force Base in California. As a result, the FAA is requiring us to conduct a mishap investigation before we can conduct further launches, which investigation is ongoing. . . . While we believe the FAA will provide its approval, there is no guarantee that we will receive such approval from the FAA in a timely manner, if at all, and any delay in such approval could have a material adverse effect on our business, financial condition, and results of operations.

95. In addition to the reasons stated in ¶¶86, 88, 91, 93, the statements set forth above in the Registration Statement (¶94) were materially false and misleading because the Registration Statement did not disclose that the issues that caused the Flight 6 anomaly were identified before Flight 6 anomaly and it was not just the FAA's mishap investigation that was causing delay. Firefly was in the process of implementing changes to correct those issues, including as acknowledged after the Class Period, that the Block II reconfiguration was based in part specifically on Flight 6. For example, the design change of lengthening the Alpha structure would allow Alpha to get more thrust and burn time, which was the fatal issue in Flight 6. Flight 6 was also the first time Firefly attempted to use its AFP Stage 2 LOX tank, and not disclosing that the anomaly in Flight 6 occurred while Firefly was using new and critical subsystems was misleading.

**B. Economic Loss**

96. As a result of the materially false misstatements and omissions made in the Registration Statement, Class Members were harmed.

97. As detailed in §VIII below, defendants' misstatements in the Registration Statement were shown to be false and misleading through a series of partial disclosures. These disclosures caused Firefly's stock price to decline to values well below the inflated IPO price, thereby injuring Plaintiffs and other Class Members who had acquired Firefly stock traceable to the Registration Statement that contained false and misleading statements and omissions.

## VII. VIOLATIONS OF §10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5

### A. Firefly and the Executive Defendants' False and Misleading Statements During the Class Period

98. Separate and apart from the untrue statements and omissions of material fact in the Registration Statement, throughout the Class Period, defendant Firefly and the Executive Defendants, Kim, Ma, and Garcia, made additional materially false and misleading statements and omitted material facts with intent to deceive, manipulate, or defraud or were severely recklessness in making them.

99. At the start of the Class Period, on August 6, 2025, Firefly's public website prominently displayed a webpage dedicated solely to the Alpha launch vehicle. Firefly falsely and misleadingly described the Alpha rocket as ready for launch and flight-proven:

> **Ready for Launch**
>
> Firefly's small-lift rocket, Alpha, is equipped to launch more than 1,000 kg to low Earth orbit in support of commercial, civil, and national security missions. ***The flight-proven vehicle is designed to be a responsive, reliable, and cost-competitive launch option, enabling direct, on-demand deliveries when and where customers need to fly***.
>
> * * *
>
> **Launch on Alpha**
>
> ***Firefly is ramping up Alpha production and ready to launch your next mission***. Alpha supports dedicated launches and rideshare missions with competitive pricing to customers' preferred orbits.

100. On August 7, 2025, prior to the market opening for the first day of Firefly's common stock trading on NASDAQ, defendant Kim participated in a CNBC (Squawk Box) interview pumping the IPO. Defendant Kim falsely and misleadingly stated that the Alpha rocket had flight heritage:

> [Jason Kim:] ***We've got flight heritage on our Alpha rocket, just on our second launch***.
>
> * * *
>
> [CNBC Commentator:] There is a huge amount, and that is what we just touched on, of appetite for this subsector of aerospace and defense right now.
>
> [Jason Kim:] So I would add on to that, you know, ***there are three companies in the nation in America that have orbital flight heritage with their rockets. Out of those three, you know, one is Firefly***.

101. Defendant Kim participated in another interview before the market opened on August 7, 2025 with Bloomberg. During the Bloomberg interview, defendant Kim falsely and misleadingly repeated that Alpha had flight heritage and claimed that Firefly had a production line of Alpha rockets:

> [Bloomberg Commentator:] You're seeing more companies actually come out of the pipeline after what's been a pretty quiet couple of years. Why did you pick this particular moment?
>
> [Jason Kim:] Well, it was always part of our strategy. I mean, if you look at what we've been doing, ***we got orbital flight heritage on our Alpha rocket, on our second launch*** . . . ***we have a production line of Alpha rockets*** . . . .
>
> * * *
>
> [Bloomberg Commentator:] I want to talk a little bit about the Alpha Rocket as well. When you think about your long term strategy, where does Alpha fit in? And how important is that?
>
> [Jason Kim:] ***Alpha is so important because it's the only one ton to space, you know, rocket in the market with orbital flight heritage***. We're rating up right now because there's so much more demand than there is supply. And so we want to be able to address that demand.

102. Also on August 7, 2025 before the market opened, defendant Kim gave an interview to *Yahoo Finance*. Seeking to take advantage of the hype surrounding the U.S. government's "Golden Dome" initiative, in the interview, defendant Kim falsely and misleadingly claimed that Alpha had flight heritage, and referring to Flight 3, the Victus Nox mission, claimed that Firefly completed a launch in 24 hours:

> [Yahoo Finance Commentator:] For those investors not familiar with your story as a company, why do you think you saw such tremendous demand on the roadshow?
>
> [Jason Kim:] ***Well this company's not aspirational, it's operational. We've got orbital flight heritage on our Alpha rocket. It's done a 24 hour launch for the Space Force. That set a gold standard***. That's going to be really important for Golden Dome.

103. When the market opened, Firefly stock surged 55.6% past its IPO price and opened at $70 per share, giving the Company a $9.84 billion market capitalization.

104. Each of the statements set forth above during the Class Period (¶¶99-102) were materially false and misleading because Firefly and the Executive Defendants knew, or were severely reckless in not knowing that:

(a) The Alpha launch vehicle did not have flight heritage, was not flight proven, and could not be claimed to be reliable. Firefly would disclose later that Alpha's four AFP tanks, among the most critical components of a rocket, had never been successfully flown. Alpha's CAD was constantly changing as part of its iterative design strategy, and constant design changes also meant constant manufacturing and integration changes as well. Firefly was constantly adapting and making changes after launches and tests, which meant it could not claim flight heritage on its then-current Alpha rocket;

(b) The Alpha launch vehicle was not operational, ready, or reliable. Later events and disclosures confirmed that Alpha was still in development and undergoing tests, and based on

those results Firefly was altering its design and trying to build a more reliable system. It did not have a "production line" of rockets;

(c) The Alpha launch vehicle was planned to be decommissioned. Part of Firefly's strategic growth plan was to have Alpha undergo a new configuration. Undisclosed to investors, Firefly had been working on significant and long-planned design changes with its "Block II," which were already being implemented, to correct identified issues with the current Alpha. However, Block II had not even completed qualification testing, and the next flights were already being built using these unqualified subsystems and components. Failing to disclose to investors that the current Alpha rocket would be decommissioned and replaced by an unqualified prototype made the claims of having a responsive, reliable, operational rocket with flight heritage – ready for the demand Firefly was purportedly seeing – materially misleading;

(d) Firefly was not ramping up Alpha production in a reliable way. Firefly would disclose later that it lacked key processes, inspections, controls, training, and a dedicated reliability team in order to successfully launch Alpha. Firefly was building Alpha based on NCRs, processes were rushed, and sign offs were bypassed; Firefly was compromising reliability for speed. Indeed, Firefly's strategy was to test separate subsystems and components multiple times and make changes along the way in order to speed up the development of Alpha. All the mid-build design changes were impacting the manufacturing and integration processes, which in turn affected the integrity of the rocket. Firefly's processes were simply not able to reliably manufacture one Alpha, much less a production line of Alpha rockets;

(e) Flight 2 was a partial failure, not one that gave Alpha flight heritage as defendant Kim claimed. The current Alpha prototype was also not the same as the Flight 2 rocket. And the current Alpha prototype was planned to be decommissioned, further making his statement

misleading because Alpha rockets in Firefly's production line were significantly reconfigured and had not even passed qualification tests; and

(f) Flight 3, Victus Nox, took eight months to prepare for and was a specialized launch. Alpha could not be launched in 24 hours, in fact, as would also later be disclosed, Alpha was still in development, needing tests for each critical component with learning from those tests continually being implemented. Further, the current Alpha was planned to be decommissioned and replaced by an unqualified prototype and therefore Alpha did not have the claimed operational, reliable and responsive capabilities.

105. On August 26, 2025, Firefly filed a Form 8-K Current Report with the SEC, signed by defendant Kim, providing an update on the April 29, 2025 Alpha Flight 6 anomaly. The report falsely and misleadingly stated that all corrective actions had been implemented and Firefly was only waiting for a window to launch:

> Fortunately, the corrective actions are straight forward: increase thermal protection system thickness on Stage 1 and reduce angle of attack during key phases of the flight. ***Corrective actions have already been implemented***.
>
> * * *
>
> ***With FAA approval to return to flight and corrective actions implemented, Firefly is now working to determine the next available launch window for Alpha Flight 7***.

106. In the same filing defendant Garcia, Alpha's Chief Engineer, is quoted as falsely confirming that all corrective actions have been implemented: "Each mission provides us with more data and enables us to continuously improve. Following all the lessons learned and ***corrective actions implemented***, we were able to further increase Alpha's reliability."

107. In addition to the reasons stated in ¶104, the statements set forth above (¶¶105-106) were materially false and misleading because Firefly and the Executive Defendants knew, or were severely reckless in not knowing that:

(a) The corrective actions following the April 29, 2025 anomaly for Alpha Flight 6 had not been implemented, and as Space Systems Command Director Lt. Gen. Philip Garrant would state after the Class Period, Firefly continued into December 2025 to work with the Space Force on "anomaly resolution activities"; and

(b) The issues that caused the Flight 6 anomaly were identified before Flight 6 and it was not just the FAA's mishap investigation concerning public safety that caused delay. Firefly was in the process of implementing changes to correct those issues, including by reconfiguring Alpha into Block II. For example, the design change of lengthening the Alpha structure would allow Alpha to get more thrust and burn time, which was the fatal issue in Flight 6. Flight 6 was also the first attempt to use Firefly's AFP Stage 2 LOX tank, and failing to disclose that the anomaly in Flight 6 occurred while Firefly was using new critical components was misleading.

108. On September 3, 2025, defendants Kim and Ma participated in the Jefferies Industrials Conference. During their interview, defendant Kim falsely and misleadingly stated that the Alpha rocket was a "tried and true rocket" and as Alpha was the only launch vehicle in its class, Firefly was able to address the demand:

> [Sheila Kahyaoglu]: Got it. And I think you've built up a plan stepping up Alpha to 24 launches per year. How do you think about the breakdown or – in terms of as you ramp production, the breakdown of customers, whether it's national security, commercial or civil?
>
> [Jason Kim:] Yeah. I mean, that's an execution story. ***We have a tried and true rocket and we're ramping up***.
>
> * * *
>
> And so, there's not a lot of – ***there's no one ton capability out there except for Alpha. So, we're able to address those [sic] demand as well***.

109. During the interview defendant Kim stated that he was involved in the Victus Nox mission for Millennium, and gave a false and misleading narrative of Alpha's 24 hour responsive

launch capabilities, including misleading specifics about attaching the payload with the adapter and fueling the rocket in the 24 hour window:

> My last role, I was at Millennium Space Systems. I was the CEO there. It's there that I actually met Firefly in the first place. Both of our companies were put on contract by the Space Force for the VICTUS NOX tactically responsive space mission. ***It was a 24-hour turnaround of launching my old company's satellite on a Firefly Alpha rocket. And Firefly absolutely nailed it***. . . .
>
> . . . And it was a really important mission, so I had to – ***it had to work and it did. It was also the hardest mission because of the condensed timeline. 24 hours is not a lot of time to accept a spacecraft, put it on the adapter, capsulate it, fuel it up. All those things that you need to do to successfully launch a spacecraft mission, Firefly nailed it***.
>
> *       *       *
>
> ***We're the only ones that did that 24-hour turnaround launch***. There will be others that continue to do that as well, but we were the first and only so far. We've got more that we're launching next year. So, ***that's a great capability***.
>
> *       *       *
>
> We need something to message to US rivals that, hey, don't mess with us. If you mess with us, we've got a capability to deter you. And so, ***that's the 24-hour timeline mission that we did on the VICTUS NOX mission. Firefly nailed that mission and really just showed the whole world that the US Space Force has this capability and is repeatable with that capability***.
>
> ***. . . And having the one-ton capability matters because you don't know what kind of countermeasure you need to put on that rocket. You don't know what altitude you go to or inclination. Having one-ton gives you a lot more options to put that effect where you need it***.

110. In addition to the reasons stated in ¶¶104, 107, the statements set forth above (¶¶108-109) were materially false and misleading because Firefly and the Executive Defendants knew, or were severely reckless in not knowing that, as stated above, Victus Nox, Flight 3, took eight months to prepare for and was a specialized launch. Alpha could not be launched on 24-hour notice, and it was also not a repeatable capability. In addition, as stated above, attaching the payload to the adapter and fueling the rocket was done during the 60-hour Activation Phase, in 24 hours.

111. On September 22, 2025, Firefly disclosed along with its 2Q25 results that while Firefly had clearance from the FAA, there would be additional weeks needed for a Flight 7 launch, and that only two launches were expected in 2025. And Firefly released its expected earnings, which were short of consensus estimates. In light of the delays to Flight 7 and the decreased launch schedule, investors began to worry about Alpha's operational readiness and reliability. But, Firefly and the Executive Defendants made additional false and misleading statements attempting to conceal and downplay these disclosures.

112. During the September 22, 2025 earnings call, defendant Kim directed investors to a picture in Firefly's Q2 Financial Results presentation, and in response to an analyst concerned about the launch timing, he falsely and misleadingly stated that both Flight 7 and Flight 8 were in a "mature state," and that quality was Firefly's "highest importance":

> [Sheila Kahyaoglu:] Maybe if we could start on the first question with the FAA approving return to flight for Alpha, how are you thinking about the timing of Flight 7 and 8 and how does that feed into your targeted launches for '26? What are the range of potential outcomes for next year, thinking about production capacity versus the current backlog.
>
> [Jason Kim:] Thank you, Sheila. We received our FAA return to flight determination at the end of August. We expect to launch Flight 7 in the coming weeks. ***If you saw our slides, in the Alpha slide, you could see that Flight 7 is in a mature state right next to Flight 8 in a mature state***, and so we keep, increasing our production capacity and we're building ahead as well for 2026.
>
> So we're working closely with the range and our customer Lock[heed] Martin to share more details on the mission and payload soon, but ***above all, safety and quality are the highest importance***.



4900-4389-9824.v1




113. On September 22, 2025 after the market closed, the false and misleading slide that defendant Kim referred to was filed with the SEC as an exhibit to a Form 8-K Current Report signed by defendants Kim and Ma. The presentation also falsely and misleadingly claimed that Alpha was the "***Only Operational U.S. Rocket in This Class***" and that Firefly was the "***FIRST & ONLY U.S.-Based Company with an Operational Rocket in the 1,000 kg Category***."

114. Defendant Kim was asked during the Q2 earnings call about any modifications to the Alpha rocket that were required after the pre-IPO Flight 6 failure. He falsely and misleadingly stated that there were no changes to the design:

> [Kristine Liwag:] Maybe on Alpha, you called out that you're going to change the design of the reinforcement of the thermal protection. ***I was wondering how much of a design changes that [sic], is that major or minor and how much is your progress there?*** . . .
>
> [Jason Kim:] Hi Kristine, it's Jason. ***There is no change to the design***, it's just adding more, layers of the thermal protection system to the bottom of the first stage, and it's negligible in terms of mass.



4900-4389-9824.v1

115. In addition to the reasons stated in ¶¶104, 107, 110, the statements set forth above (¶¶112-114) were materially false and misleading because Firefly and the Executive Defendants knew, or were severely reckless in not knowing that:

(a) Flight 7 and Flight 8 were not in mature states. At least Flight 7's Stage 2 LOX tank had never been flown successfully and Flight 8 had not even undergone qualification testing; and

(b) Alpha was already planning its Block II reconfiguration, with significant design changes. Lengthening the Alpha structure would allow Alpha to get more thrust and burn time, which was the fatal issue in Flight 6. Defendant Kim would admit after the Class Period that Block II upgrades were specifically based on Flight 6.

116. On September 25, 2025, before the market opened, Ars Technica, a well-known website covering technology and science, posted an article quoting the CEO of a Firefly customer complaining that the Alpha engines had design and engineering problems. Firefly provided a statement published in the same article claiming that Firefly's engines have performed flawlessly, and repeated the false and misleading narrative that Alpha was flight-proven:

> "Reaver engines built by Firefly have powered our Alpha launch vehicle to orbit multiple times and have performed flawlessly. In addition, our patented tap-off engine technology used across our family of engines has been hot-fired more than a thousand times and counting. ***Firefly has full confidence in our engineering and the design of our flight-proven Alpha systems***."

117. In addition to the reasons stated in ¶¶104, 107, 110, 115, the statements set forth above (¶116) were materially false and misleading because Firefly and the Executive Defendants knew, or were severely reckless in not knowing, that Firefly could not have full confidence in its engineering and design because flight heritage is required for full-confidence, Alpha was not flight-proven, and instead, Alpha's engineering and design was constantly changing.

### B. Allegations of Firefly and the Executive Defendants' Scienter During the Class Period

118. During the Class Period, Firefly and the Executive Defendants acted with scienter. The allegations herein support that these defendants knew, or recklessly disregarded, that their Class Period statements to investors in press releases, earnings reports, during earnings calls, in interviews, and to the press were materially false and misleading.

#### 1. Admissions After the Class Period Show Scienter

119. Firefly's own statements and admissions after the Class Period concede contemporaneous knowledge of facts or access to information contradicting their public statements at the time those statements were made. *See infra*, §VIII. For example, after the on the ground explosion, the Company admitted that it still needed to test "each critical component, engine, and vehicle stage" and that Firefly was using those tests to still "improve our designs and build a more reliable system." Later with the Block II configuration announcement, Firefly would admit that it was completing "hundreds of hardware tests" that drove the changes to Alpha's configuration. The Block II reconfiguration had been intended to fix known and anticipated reliability, manufacturability, configuration, structural, and other quality shortcomings.

120. In addition, defendants admitted that these changes were not just after the Flight 7 anomaly, rather, Alpha was scheduled as part of Firefly's strategic growth plan to be reconfigured with significant changes, all planned and actually being implemented prior to the Class Period. After the Class Period, on January 13, 2026, Firefly and the Executive Defendants' statements acknowledged that the Alpha reconfiguration "***has been part of Firefly's strategic growth plan***" all along. Firefly's strategic growth plan was to, in fact, decommission Alpha with the reconfigured launch vehicle that had not even passed qualification testing. Indeed, contradicting their Class Period statements of "no change" to Alpha's design stemming from the pre-IPO Flight 6 anomaly,

after the Class Period, they went on to acknowledge that changes included in Block II actually were from Flight 6.

121. Because of these design and manufacturing changes, the Executive Defendants knew, or were severely reckless in not knowing, that Alpha never had flight heritage, and certainly would not have flight heritage until it was able to complete its Block II maiden flight, which as of this filing has not happened (and is not even scheduled). Yet the Executive Defendants told investors that Alpha had proven flight heritage, and was reliable and operational.

122. The Company also admitted Firefly lacked key processes, controls, and needed to revamp its existing procedures. Firefly had to create a new reliability team and implement training, and even undertake repeated exercises to maintain its new processes. Firefly admitted that the Company needed to enhance its reliability and quality culture, and start using best practices.

123. All these admitted facts existed and were known to or recklessly disregarded by Firefly and the Executive Defendants throughout the Class Period, and their Class Period statements misrepresenting and omitting these facts raises a strong inference of scienter.

### 2. The Executive Defendants Were Involved in the Alpha Launch Vehicle Build

124. As alleged herein, the Executive Defendants were involved in each critical step of the Alpha build, and had information concerning the launch vehicles' design, manufacturing, and integration issues. They discussed the progress of the build in all-hands meetings, continually visited the manufacturing facilities, and the Company had live streaming updates for milestones during the Alpha rocket build. Garcia, as Firefly's Alpha's Chief Engineer, intimately knew the design, workings, and progress of Alpha's development, including from receiving daily emails beginning with integration until launch.

125. Further, as set forth below, on an earnings call, defendants Ma and Kim also discussed in great detail some of the purported "corrective measures" "we" took regarding Alpha, acknowledging the Executive Defendants' deep involvement in testing, configuration updates, and continuing to work on Alpha's quality, process, and other shortcomings, with Kim stressing that "***quality has been a major focus for me this past year at Firefly***."

126. The Executive Defendants' direct reports also received daily updates during Alpha's integration, testing, and transport to the launching pad until launch. Indeed, the Executive Defendants were privy to and reviewed confidential proprietary information concerning Alpha, and as the top executives presiding over Alpha's build, tests, and launches could access any information about its design, manufacturing, integration, and production processes. They knew or recklessly disregarded that the Alpha rocket did not match the CAD, but was built off of NCRs and shortcuts, and Firefly lacked key processes, including critical inspections and controls.

127. Thus, the Executive Defendants knew, or were severely reckless in not knowing, all the design, manufacturing, and integration issues prior to and during the Class Period, and yet told investors a very different story.

### 3. The Executive Defendants Were Involved in the Alpha Strategy of Designing While Building

128. The Executive Defendants knew, or recklessly disregarded, that changes to the Alpha launch vehicle's design, manufacturing, and integration processes continued throughout each Alpha build, and that Alpha was being built while previously identified issues were not yet corrected or analyzed. Indeed, this was the Company's strategy because testing a full launch vehicle would take too long, and the Executive Defendants pushed their employees to speed up processes.

129. As alleged herein, on January 13, 2026, Firefly and the Executive Defendants' statements acknowledged that the Alpha reconfiguration "***has been part of Firefly's strategic***

***growth plan***" all along, which included "***data and lessons learned from our first six Alpha launches and hundreds of hardware tests***." The CEO, CFO, and Alpha's Chief Engineer were certainly involved in setting the strategic plan of Firefly's flagship product Alpha. In Firefly's 2025 annual report, Firefly stated that defendant Kim is the Chief Operating Decision Maker, who makes the operating decisions, assesses financial performance, allocates resources, determines investment opportunities related to product development, platform enhancements, and new technologies, and monitors budget versus actual results. Likewise, Firefly's bylaws gave the CFO all the powers "incident to the position of CFO," which included planning, allocating and overseeing budgets and related resources for the Company's projects, and defendant Ma was responsible for reporting the "operations of the Corporation" to the Board. And as Alpha's Chief Engineer, Garcia was responsible for the Alpha launch vehicle's design, manufacturing, and integration.

130. As Firefly and the Executive Defendants spoke in detail about changes, updates and fixes to Alpha in response to analyst questions during earnings calls, and expressed "confidence" in Alpha's design, each knew, or were severely reckless in not knowing, that Alpha was constantly being redesigned per the Company's strategic plan and that Firefly's iterative design process involved testing critical components and making design changes, all while it was building the current and new Block II Alpha rocket.

### 4. Alpha Is Critical to Firefly's Core Operations

131. A strong inference of Firefly and the Executive Defendants' scienter also arises under the core operations doctrine, because the topics of the false and misleading statements, including Alpha's design, operational capabilities, launch history, manufacturing, and production processes concerned Alpha, which was of critical importance to the Company.

132. Alpha was to be Firefly's workhorse rocket, carrying payloads for commercial customers as well as supporting Department of Defense and Space Force missions, including Golden

Dome, amid a claimed explosion in demand for small rockets. The success of each Alpha launch was critical to Firefly's success and the continued vitality of the Company. Indeed, the Registration Statement acknowledged that "[t]o be successful, we will need to maintain a sufficient launch rate, which will be negatively impacted if we are not able to operate Alpha for any reason." Firefly told investors that the Alpha launch vehicle represented more than half of Firefly's backlog, and stock analysts clung to and analyzed their disclosures about Alpha's progress.

133. Firefly was also a small company, where the Executive Defendants were familiar with the day-to-day operations, especially critical issues and milestones for Alpha. Firefly's three primary locations, headquarters, spacecraft facility, and manufacturing and testing site, were only 25 miles apart. Alpha's progress was discussed company-wide, and at critical times live streams were broadcast and executives received daily updates. The fact that Alpha had mishaps in the recent past made it even more likely that the Executive Defendants would have paid extra scrutiny to all facts relevant to Alpha and its ability to launch successfully and meet its publicly stated launch cadence.

134. In addition, with the U.S. military involved in "anomaly resolution activities" from the April 29, 2025 Flight 6 anomaly, the Executive Defendants knew, or were severely reckless in not knowing, that all corrective actions had not been taken as they claimed to investors. Similarly, investments like the AFP machine – a massive, expensive machine – were closely monitored by the Executive Defendants (as CEO, CFO, and Alpha's Chief Engineer), and its successes and setbacks in manufacturing Alpha's tanks were constantly monitored.

### 5. The Executive Defendants Held Themselves Out to Investors as the Most Knowledgeable About the Relevant Issues

135. The Executive Defendants' extensive knowledge of the false and omitted material information is illustrated by the fact that these defendants also: (i) discussed Alpha and production in great detail in each earnings call and most SEC filings; (ii) responded in detail to direct questions

from analysts about Alpha, its design, and manufacturing; (iii) claimed to have participated in, and had knowledge of, each launch vehicle, Alpha's production and preparation, launches, and post-launch analysis; and (iv) had extensive experience in their industry. Indeed, the specific undisclosed issues involved critical information for investors concerning Firefly and Alpha, and the Executive Defendants held themselves out as those most knowledgeable during the Class Period about these issues.

### 6. The Executive Defendants Were the Employees with the Most Authority over the Company's Public Statements

136. The Executive Defendants knowingly or recklessly participated or acquiesced in the issuance or dissemination of material misstatements and omissions. Firefly and the Executive Defendants controlled the contents of Firefly's public statements during the Class Period, and were each provided with, or had access to, the information alleged herein to be false or misleading prior to or shortly after its issuance, and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, and their direct oversight of the Alpha build, preparation, launch, corrective actions, and financing therefor, the Executive Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were false and misleading.

### 7. The Executive Defendants Had Motive and Opportunity to Commit Fraud

137. Each of the Executive Defendants were financially motivated by their executive compensation plans, which incentivized maintaining Firefly common stock at an artificially high price. At the start of the Class Period, defendant Kim owned 2,872,207 shares of Firefly common stock and defendant Ma owned 1,435,104 shares of Firefly common stock. When the market opened for trading in Firefly common stock, it opened at $70 per share, making defendant Kim's ownership

of Firefly worth over $201 million, and defendant Ma's ownership over $100 million. These shares were locked up during the entire Class Period, and thus, defendants Kim and Ma had the additional incentive of keeping the price of these shares artificially inflated for the duration of the lock-up period.

138. In addition to their stock ownership, defendants Kim and Ma were compensated via salary and bonuses. Defendant Kim had a base salary of $500,000 per year, and defendant Ma a base salary of $400,000. They also each received bonus payments that were tied to, among other things, "a balance sheet cash target." In other words, how much money they raised in the IPO impacted their bonus. For 2025, defendant Kim received a $500,000 cash bonus, over $36 million in stock awards, and another $1.1 million stock options. Defendant Ma received a $252,000 cash bonus and over $9 million in stock awards, and another $1.6 million in stock options.

**C. Loss Causation and Economic Loss**

139. As shown below in §VIII, the decline in the price of Firefly stock after each corrective disclosure came to light was a direct result of the nature and extent of Firefly and the Executive Defendants' misrepresentations being revealed to investors and the market. Plaintiffs allege that the disclosures, as alleged in more detail in the paragraphs below, prior to the following significant declines, caused the price of Firefly's stock to fall:

(a) On September 23, 2025, the partial disclosures made after the market closed during Firefly's 2Q25 results earnings call caused the price of Firefly's common stock to fall 15.31%, from $49.52 per share to $41.94 per share, on a high trading volume of approximately 3.6 million shares;

(b) On September 25, 2025, in reaction to the partial disclosures in the Ars Technica article, the price of Firefly's common stock fell 7.15%, from $40.56 per share to $37.66 per share, on a heavy trading volume of approximately 2.4 million shares;

(c) On September 29, 2025, the Alpha Stage 1 was completely lost in an on-the-ground test. The Company also disclosed that Firefly still needed to run tests on each critical component and made design changes after running each test. Based on these disclosures, over the next two days Firefly's common stock fell 27.84%, declining from $36.96 per share at the close of trading on September 29, 2025 to $26.67 per share at the close of trading on October 1, 2025, with heavy trading on both days of approximately 12.8 million shares traded;

(d) On November 17, 2025, based on the disclosures in Morgan Stanley analysts' report, the price of Firefly's common stock fell 15.12%, falling from $22.95 per share to $19.48 per share, on a high trading volume of approximately 3.6 million shares; and

(e) On November 20, 2025, based on the disclosures in Goldman Sachs analysts' report, the price of Firefly's common stock fell 12.87%, falling from $19.42 per share to $16.92 per share, on a high trading volume of approximately 2.8 million shares.

140. These disclosures and events, including the magnitude of the explosion and the total loss of the Stage 1, showed that Firefly and the Executive Defendants' Class Period claims about Alpha were false and misleading. The timing and magnitude of the price declines in Firefly stock negate any inference that the losses suffered by Plaintiffs and other Class Members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Firefly and the Executive Defendants' material misrepresentations.

141. Firefly and the Executive Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class Members' economic loss. The market for Firefly's common stock was open, well developed, and efficient during the Class Period. Throughout the Class Period, Firefly's stock traded at artificially inflated prices as a direct result of Firefly and the Executive Defendants' false and misleading statements and omissions, which were widely

disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other Class Members purchased or otherwise acquired Firefly's stock relying upon the integrity of the market price for Firefly's stock, and have been damaged thereby.

142. As detailed below, the Class Period inflation in Firefly's stock price was removed when information concealed by Firefly and the Executive Defendants' false or misleading statements and omissions was revealed to the market. When Firefly and the Executive Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Firefly common stock declined as the prior artificial inflation came out of the stock's price.

143. Plaintiffs and the other Class Members suffered economic loss, *i.e.*, damages as a result of their purchases of Firefly common stock during the Class Period. The economic loss suffered by Plaintiffs and the other Class Members was a direct result of the nature and extent of the Firefly and the Executive Defendants' false and misleading statements and omissions being revealed to investors and the market.

**D. Applicability of the Presumption of Reliance and Fraud on the Market**

144. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiffs and other Class Members purchased Firefly common stock between the time defendants misrepresented, or failed to disclose material facts, and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

145. At all relevant times, the market for Firefly common stock was an efficient market for the following reasons, among others:

(a) Firefly common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b) As a regulated issuer, Firefly filed periodic public reports with the SEC;

(c) Firefly regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) Firefly was followed by securities analysts employed by major brokerage firms who also wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Many of these reports were publicly available and entered the public marketplace; and

(e) Market makers, underwriters, liquidity providers, and brokers supported trading in Firefly's common stock.

146. As a result of the foregoing, the market for Firefly common stock promptly digested current information regarding Firefly from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Firefly common stock during the Class Period suffered similar injury through their purchases of Firefly common stock at artificially inflated prices and a presumption of reliance applies.

147. A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions. Because this action involves defendants' failure to disclose material, adverse information regarding Alpha, Firefly's business operations, and its financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII. DISCLOSURES CONCERNING THE ALPHA LAUNCH VEHICLE

148. The undisclosed facts about Alpha became known to the market in a series of events and disclosures. These disclosures corrected the false and misleading statements and caused Firefly's stock price to precipitously decline, causing Class Members' economic loss.

149. On September 22, 2025, after the market closed, Firefly announced its 2Q25 results and held its first earnings call since its IPO. In a previous Form 8-K, filed with the SEC on August 26, 2025, Firefly had publicly stated that for the next flight, Flight 7, it was only waiting for the "next available launch window." But now a month later, during the September 22, 2025 earnings call, Firefly still only generally commented that the flight was expected "in the coming weeks." Firefly also disclosed that "we expect to launch Alpha 2 more times this year," instead of the three it announced during the roadshow. These disclosures threw the narrative of Alpha's launch cadence, based on purportedly "operational," "reliable," "proven," and "ready for launch" Alpha rockets, in jeopardy. Firefly released its expected earnings for 2025 reflecting these changes, stating "we currently expect revenue will be in a range of $133 million to $145 million" for the year, which also missed market expectations.

150. Investors and analysts began to worry that Alpha was not operational and faced execution risks due to its lack of readiness and reliability. For example, Deutsche Bank's analysts in their September 23, 2025 report maintained a hold recommendation at the IPO price of $45 per share, and discussed increased execution risk:

> [T]here was no revenue recognized from Alpha FLTA006 because of the anomaly
>
> *   *   *
>
> While we have confidence in the management team and the longer-term vision resonates with us, ***there appears to be some execution risk in the near-term*** around scaling up the launch cadence and valuation seems mostly balanced.

151. Likewise, Morgan Stanley's report the same day, noted a: "***Modest shortfall***" in the financial results versus consensus, and that execution risk was the key to Alpha's growth. It stated: "FLY reported 2Q25 revenue and adj. EBITDA slightly below consensus expectations . . . . With Alpha cleared to return to flight and ~$1bn in post-IPO cash, ***execution remains the key to unlocking growth***."

152. On this news, on September 23, 2025, the next trading day, the Company stock fell 15.31%, from $49.52 per share to $41.94 per share, on a high trading volume of approximately 3.6 million shares.

153. As noted above, on September 25, 2025, before the market opened, Ars Technica, a well-known website covering technology and related topics, posted an article that quoted the CEO of a Firefly customer, Astra Rocket, criticizing Firefly's abilities to create production engines that matched the CAD, the 3D modeling used in engineering and manufacturing:

> "There is a company called Firefly. They went public," Kemp said, sniggering. "***We bought the engine from them, and it was garbage. We literally could not get the same engine twice from them. And none of them matched the CAD. And if you're in engineering, you know that just doesn't work***. So we basically had to start from scratch with this engine."

154. This disclosure raised questions about Alpha's design, including the undisclosed information that Alpha was never built accurately to its CAD drawings. The article was also widely circulated on social media, and in reaction to this additional partial disclosure, the price of Firefly's common stock fell 7.15%, from $40.56 per share to $37.66 per share, on a heavy trading volume of approximately 2.4 million shares.

155. Then in the afternoon of September 29, 2025, the Alpha launch vehicle experienced a spectacular failure while undergoing an on-the-ground test of its Stage 1. The explosion resulted in the total loss of Alpha's Stage 1 for its next flight.

156. The Class Period ended when the Company put out a statement after the market closed on September 29, explaining the extent of and reasons for the failure: "***During testing at Firefly's facility in Briggs Texas, the first stage of Firefly's Alpha Flight 7 rocket experienced an event that resulted in a loss of the stage***." The Company admitted that, in fact, every critical component still needed testing, and based on those tests Firefly continued to alter the design of Alpha: "***[W]e test each critical component, engine, and vehicle stage to ensure it operates within our flight requirements before we ship to the launch pad***. ***We learn from each test to improve our designs and build a more reliable system***."

157. The failure and subsequent disclosures showed that Firefly's Alpha was not operational, ready for launch – much less in 24 hours – or reliable, as claimed in the Registration Statement and during the Class Period. The design changes from ongoing tests meant that the Alpha launch vehicle also did not have flight-heritage, and defendants had inaccurately claimed that Alpha was "tried and true" and reliable. And the scale of the explosion – especially as it was on the ground and only of a partially assembled rocket – showed that Firefly did not have the rigorous design, manufacturing, and testing processes and practices that it claimed to have.

158. The complete loss of the Alpha Flight 7 Stage 1 was reported on by stock analysts, who now recognized the previously undisclosed risks to Alpha in the near-term – Alpha was still in development. For example, Roth Capital's September 30, 2025 report stated: "***Test Stand Anomaly Increases Near-Term Alpha Launch Cadence Uncertainty***." Jefferies' September 30, 2025 report, titled "Flight 7 First Stage Lost on the Test Stand," stated: "***With the loss of the first stage of Alpha flight 7 and an investigation to figure out what went wrong ongoing, there is some uncertainty to the near-term outlook for Alpha***."

159. Further, Morgan Stanley's September 30, 2025 report highlighted that Firefly was a "company that is still early in the technology curve" but had the IPO funding to ***now*** "get the technology right:"

> ***On Firefly's 2Q25 earnings call on September 22, 2025, management noted that it was preparing for Flight 7, which was slated to fly within the coming weeks***. . . . We expect the market to receive the news negatively, as the anomaly introduces the risk of further delays to Alpha Flights 7 and 8, which are key milestones for re-establishing Firefly's commercial launch cadence.
>
> In our view, ***this explosion of Stage 1 during ground testing highlights the technical risk that remains with the company that is still early in the technology curve***. . . . However, we recognize that post IPO, with ~$1bn of cash on the balance sheet, Firefly has enough funds in the medium-term ***to get the technology right***.

160. These disclosures caused the price of Firefly' stock to plummet, and over the next two days the price of Firefly's common stock fell 27.84%, from $36.96 per share at the close of trading on September 29, 2025, to $29.32 per share at the close of September 30, 2025, to $26.67 per share at the close of trading on October 1, 2025. Both days had heavy trading volume of approximately 12.8 million shares on September 30, 2025 and over 7.6 million shares on September 30, 2025.

161. The truth about Firefly and Alpha continued to leak out over the next couple months.[10] On November 12, 2025, the Company (including defendants Kim and Ma) held its 3Q25 earnings call and disclosed its explanation for the on-the-ground failure. Demonstrating the inaccuracy of defendants' prior statements, including that the Company had employed operational processes to ensure rigorous quality standards, defendant Kim acknowledged that the test stand failure was due to an undetected production process error during the Stage 1 assembly:

> A few weeks ago, an event during a ground test firing at our facility in Texas led to the loss of the Alpha first-stage booster that we were preparing for Flight 7. Following a thorough review, ***Firefly identified a process error during Stage 1 integration that resulted in a minute hydrocarbon contamination, which then led to a combustion event in one of the engines during the ground tests***.[11]

162. While he previously told investors all the corrective actions from the pre-IPO Flight 6 anomaly had been implemented, defendant Kim admitted that Firefly in fact throughout the Class Period did not have rigorous, high-quality and operational processes for design and manufacturing in place, meaning that the Class Period testing processes could not be replicated or scaled for successful production as defendants had previously claimed. In fact, Firefly had to implement

---

[10] On October 5, 2025, Firefly announced that it was buying a software company called SciTec. Morgan Stanley's analyst report from October 6, 2025 questioned the timing of the acquisition, and why Firefly was diversifying away from Alpha for an entirely separate business line. The report stated:

> [T]his acquisition consumes $175mn of the cash proceeds raised during the company's recent IPO process and draws $125mn from the company's revolving credit facility – at a time when FLY is looking to stabilize its Alpha rocket program following a launch anomaly and the subsequent loss of a first-stage booster during ground testing. We also note the potential addition of SciTec, which is focused on defense software and is working through the Space Force's FORGE (Future Operationally Resilient Ground Evolution) program to modernize ground systems for missile warning applications, represents somewhat of a departure from FLY's core capabilities in rocketry and space vehicles.

[11] A hydrocarbon contamination is stray fuel compromising the system. Alpha uses Rocket Propellant-1 (RP-1), a hydrocarbon fuel, and LOX as its propellants.

additional key processes that were lacking before it could reliably make, much less launch, Alpha rockets:

> We immediately took action and implemented corrective measures, including a production stand down day. As this was not a design issue, ***those corrections included increasing inspection requirements for the fluid systems, optimizing the first-stage sensors, and incorporating additional automated aborts for testing***. ***We also implemented key process improvements following the stand down day where the production, integration, and test teams conducted exercises to review and optimize existing procedures. As part of Firefly's effort to improve reliability and quality, the team will continue to hold regular exercises for sustained process enhancements***.

163. Acknowledging with detail that a launch could not be done in 24 hours, defendant Kim admitted that every Alpha flight actually required a "test campaign," which is a comprehensive series of tests designed to qualify rockets. Thus, Alpha was not a production line vehicle as he had claimed during the Class Period:

> Flight 7 will now utilize the next Alpha first stage booster from our production line, which is currently undergoing final preparations for shipment to our launch site in Vandenberg.
>
> ***Prior to the event, we had already tested the second stage and fairing and delivered them to the launch site. As part of Firefly's test campaign ahead of each launch, the team will then conduct a static fire test at our launch pad prior to Flight 7 launch***.

164. In response to an analyst's question for more details on how investors could believe in the "repeatability of your capabilities," defendant Kim attempted to show changes Firefly had made in order to calm investors. He framed his response in the most positive light possible, but nonetheless disclosed that during the Class Period, Firefly did not have certain key processes, and now needed to "hold regular exercises" to sustain those processes. He further acknowledged that, in fact, Firefly needed a reset, to utilize industry best practices, meaning they were not used before, and change Firefly's quality culture:

> [Kristine Tan Liwag:] Great. Super helpful. And then also just looking back regarding your launch success, the Launch 6 was a failure. And then, this most recent

ground testing, this anomalous event also was a failure. ***So, when you look at the repeatability of your capabilities, can you walk us through what you're changing in your operational structure to make sure that the subsequent launches here would be successful?*** Are there changes that you're implementing? And how should we think about your path towards a repeatable, successful launch?

[Jason Kim:] Yeah. Thank you for that question. Yeah. Following the test events, we immediately took action and implemented corrective actions, which I mentioned before, is – ***includes increasing the inspection requirements for the fluid systems, optimizing some first-stage sensors, and also incorporating additional automated aborts. We also had a day-long quality stand down with production, integration, and test teams where we implemented key process improvements. We conducted a number of exercises to review and optimize our existing procedures. And we're going to continue to enhance our reliability and quality culture***.

The team is going to continue to ***hold regular exercises for these sustained process enhancements. I will say that safety and quality has been a major focus for me this past year at Firefly. After the test event, the team immediately started the root cause analysis. And when initial findings showed the process errors***, that's when I immediately requested a full stand-down of – stand-down production integration and quality test team stand-down day required all of the executive leaders also to attend. ***And this was our moment to utilize industry best practices and reset, refocus, and return us to flight***.[12]

165. Defendant Kim nevertheless downplayed the testing failure, claiming: "The test stand structure remained fully intact" – which was also false.[13] He also claimed: "Our Flight 7 launch is targeted between late fourth quarter to early first quarter, depending on range availability." Firefly then increased its projected revenue for 2025 to between $150 million and $158 million.

166. Initially, the market accepted Firefly's assurances, but on November 17, 2025, prior to the market opening, Morgan Stanley's analysts issued a report, titled "***Regaining Launch Footing; Lowering PT to $27***," which slashed the analysts' price target in half, from $52 per share

---

[12] On Firefly's March 19, 2026 earnings call, defendant Kim would also disclose that Firefly needed a "***dedicated reliability team within Firefly. We analyzed vulnerabilities; improved processes. We added new launch aborts, reinforced contamination control, and implemented additional trainings***."

[13] Deep within a filing with the SEC on Form 10-Q for 2Q25 the Company disclosed that "On September 29, 2025, during testing at Firefly's facility in Briggs, Texas, the first stage of Firefly's Alpha Flight 7 rocket experienced an event ***that resulted in damage to the test stand***."

to $27 per share (well below the IPO price of $45 per share) and questioned the credibility of Firefly. Morgan Stanley stated:

- ***We expect the push-out of Flight 7 to have a cascading effect on the manifest, likely shifting planned launches next year to the right***; and
- Multiple upside, in our view, is ***limited until FLY can credibly demonstrate Alpha reliability***; expect volatility ahead of Flight 7.

167. Notably, even though Firefly's management still said Flight 7 could be launched in 2025, Morgan Stanley no longer believed them saying: "***The updated guide accounts for the slip-out of Flight 7 and Flight 8 from this year's revenue***."

168. The news media reported on Morgan Stanley's massive target price reduction, including Dow Jones Newswires, MT Newswires, and financial news outlets such as GuruFocus, Benzinga, and Investing.com. On November 17, 2025, based on the Morgan Stanley analysts' report, Firefly's stock fell another 15.12%, with the stock price falling from $22.95 per share to $19.48 per share, on a high trading volume of approximately 3.6 million shares.

169. On November 19, 2025, after the market closed, Goldman Sachs' analysts also issued a report with a massive price target reduction, down to $29 per share from $54 per share. The report reflected the analysts' conclusion of "less visibility," meaning the Company's disclosures were not clear, and that Firefly was not a near-term investment anymore. The report cautioned investors, stating its estimate revisions took into account a higher "Operational execution" risk as the number one key risk:

> Although the failure alone does not change the long-term opportunity for FLY, it does introduce ***less visibility*** into the ramp-up in launch cadence and makes the success of the next launch more difficult to underwrite.
>
> * * *
>
> We continue to see an attractive ***medium-to-long-term investment case*** for FLY. However, the launch industry comes with inherent risk, and ***the company's recent launch mishaps brings us caution***.

*        *        *

***Key risks include: 1) Operational execution*** . . . .

170. Goldman Sachs analysts' report was also reported on by the financial news media, and caused the price of Firefly stock to fall further. On November 20, 2025, Firefly's stock fell another 12.87%, from $19.42 per share the prior day to $16.92 per share, on a high trading volume of approximately 2.8 million shares.

171. Details confirming that the Registration Statement and the Executive Defendants' statements during the Class period were false and misleading continued to emerge. At the December 2025 Spacepower Conference, Lt. Gen. Philip Garrant, Commander, Space Systems Command at Space Force, told reporters that Space Force had delayed its Victus Haze launch (Flight 8) to 2026 because resolution of issues stemming from Firefly's April 2025 and September 2025 anomalies was still ongoing. This contradicted the statements during the Class Period that all corrective actions had been taken for the April 29, 2025 anomaly. On December 15, 2025, Air & Space Forces Magazine reported:

> Then in April, Firefly's Alpha rocket – which flew the first TacRS demo and is on deck to launch Victus Haze – had a mishap, losing the rocket and its payload. In late September, Alpha experienced a separate anomaly during a preflight ground test and lost its first stage as a result.
>
> The company has since been cleared by the Federal Aviation Administration to launch, but Space Systems Command Director Lt. Gen. Philip Garrant told reporters Dec. 10 ***his team is working closely with Firefly to monitor its "anomaly resolution activities"*** and has pushed Victus Haze to 2026.
>
> "We want it to be successful, ***we want it to have learning***," Garrant said during a media briefing at the Spacepower Conference in Orlando, Fla. "***We're going to continue working closely with the launch provider and industry to make sure that they're successful***."

172. On December 11, 2025, Firefly announced, without any explanation, that effective December 6, 2025, its COO, Dan Fermon, had stepped down. But his successor was not

immediately lined up, and the incoming COO, Ramon Sanchez, did not begin in his role until December 22, 2025. Part of the new COO's mandate was "ensuring Firefly continues to enhance safety, quality, and reliability in production."

173. Over five months after the IPO, on January 13, 2026, Firefly belatedly disclosed that, in fact, the Alpha launch vehicle was going to be reconfigured with significant changes made to "increase reliability." Defendant Kim was quoted in the January 13, 2026 announcement, admitting that the reconfiguration "***has been part of Firefly's strategic growth plan***," and the announcement acknowledged it was already being built "***for Flight 8***." In other words, since prior to the Class Period, the Executive Defendants had planned to reconfigure and indeed were building a reconfigured Alpha, specifically for reliability and manufacturability, but did not disclose this to investors.

174. Defendant Kim also admitted that the significant changes, which Firefly was now calling "Block II," were from all six flights, including the sixth one which he claimed resulted in no design changes, and that hundreds of tests were being incorporated into the Block II upgrade:

> "***The Block II upgrade has been part of Firefly's strategic growth plan*** to meet the evolving needs of the growing global launch market and further supports Firefly's culture of continuous improvement with a focus on enhanced safety, quality, and reliability," said Jason Kim, CEO of Firefly Aerospace. "Firefly worked closely with customers and ***incorporated data and lessons learned from our first six Alpha launches and hundreds of hardware tests to make upgrades that increase reliability and manufacturability with consolidated parts, key configuration updates, and stronger structures built with automated machinery***."

175. The significant changes to the Alpha vehicle were both to design and manufacturing, including:

(a) Extending the length of the Alpha rocket by seven feet;

(b) Extensions to both Stage 1 and Stage 2;

(c) Changes to allow for manufacturing on the Automated Fiber Machine;

(d) Increasing the strength of "all" carbon composite structures;

(e) Replacing non-Firefly batteries and avionics with a now consolidated system built in-house;

(f) Improving the thermal protection system; and

(g) Changing the LOX and RP-1 tank configurations to increase stage burn time.

176. Remarkably, the Company acknowledged that Block II had yet to even pass qualification testing, much less the integration and testing phases, which would be required thereafter:

> **Firefly Aerospace Announces Alpha Block II Configuration Upgrade for Flight 8**
>
> ***Block II upgrade designed to increase reliability*** and expand Alpha's capability to support responsive launches across the globe; ***Qualification testing underway*** for Block II second stage hardware for Alpha Flight 8 at Firefly's Rocket Ranch in Briggs, Texas.

177. This disclosure also contradicted defendant Kim's statements during Firefly's September 22, 2025 earnings call, wherein he directed investors to a picture of Flight 8 being built, claiming it was in a mature state, when in fact, it had not even been qualified.

178. Further still, Firefly was now calling Flight 7 – the next flight from the IPO – a "test flight." Indeed, Flight 7 only carried a "dummy" payload, when Firefly previously told investors that the Flight 7 payload was a military "TacSat" for Lockheed Martin. Firefly also admitted that "key systems" did not have flight heritage, meaning that Firefly was dependent on an Alpha launch vehicle that had not been fully validated and with no flight heritage to meet its purported Alpha capabilities – and thus Alpha during the Class Period was simply not operational:

> Firefly's upcoming Alpha Flight 7, targeted to launch in the coming weeks, will be ***the last flown in the current configuration and will serve as a test flight*** with multiple Block II subsystems in shadow mode ***to gain flight heritage and validate lessons learned*** ahead of the full Block II upgrade on Alpha Flight 8.

*          *          *

> Some of these upgrades, including the in-house avionics and thermal improvements, ***will be tested*** on Alpha Flight 7. . . .
>
> ". . . ***Firefly is utilizing Flight 7 as an opportunity to test key systems*** ahead of the full Block II upgrade on Flight 8 . . ." "This approach allows us to accelerate our planned Block II timeline and validate ***the improvements designed to enable more mass savings, optimize production, and increase reliability across the entire Alpha vehicle***. Our flight-proven Reaver and Lightning engines and carbon composite structures continue to be the backbone of this rocket, so that core technology doesn't change."

179. Finally, on March 11, 2026, over seven months after the IPO, Firefly completed its next test flight carrying a dummy payload. Alpha would now be decommissioned, and configured with the Block II changes. In a YouTube video posted by Firefly covering the demonstration, Firefly Structures Engineer Morgan Feanny discussed Block II and said: "[A]ll of our barrels ***will now be made*** with the AFP. So all of our structures are a carbon fiber composite. ***Flight 6 had the very first AFP tank. We flew our S2 LOX [Stage 2 LOX tank], was an AFP tank***. ***And this time for Block II, it will be all of them***."

180. But Flight 6 was the flight prior to the IPO that was a mission failure. Thus, at the time of the IPO, Alpha's Stage 2 LOX tank ***had never been flown successfully***, and the other three AFP tanks ***had never been flown at all***. The Registration Statement's claims about Alpha being built with AFP tanks to ensure unified production methodology was thus misleading because three out of four tanks had never flown, and the only one that had flown had ended in a mission failure. This revelation also further confirmed that the Alpha launch vehicle at the time of the IPO did not have flight heritage.

181. Alpha's next flight, Flight 8, pursuant to Firefly's strategic plan, is still undergoing qualification testing, currently targeted for its demonstration sometime in September 2026 – over a

year after the Registration Statement claimed Alpha already had flight heritage and was a rocket ready to fulfill critical space missions.

## IX. NO SAFE HARBOR

182. The "Safe Harbor" warnings accompanying Firefly's reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. To the extent that projections were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Forms 8-K, they are excluded from the protection of the statutory safe harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

183. Defendants are also liable for any false and misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Firefly who knew that the forward-looking statement was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made. In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.

184. Firefly's purported cautionary language is inadequate to insulate defendants' false statements under the statutory safe harbor because each of the disclosures is vague and boilerplate. In multiple instances, the purported risks were referenced as potential or contingent future outcomes

when in fact the purported risks warned of had already come to fruition and were negatively impacting the Company.

## X. CONTROL ALLEGATIONS

### A. The Signer Defendants' Control Over Firefly and the Registration Statement

185. Prior to and at the time the time of the IPO, the Signer Defendants controlled Firefly. Through their involvement on Firefly's Board and Board committees, and involvement in day-to-day management, the Signer Defendants were able to control Firefly.

186. In addition, the Signer Defendants were able to and did control the content of the Registration Statement and completion of the IPO. They had access to adverse undisclosed information about Alpha and other adverse facts that rendered the positive representations made in the Registration Statement, as detailed herein, materially false and misleading. Without their signatures, authority, and/or consents the Registration Statement would not have been filed and the IPO would not have been completed. The Signer Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged in the Registration Statement and approved or ratified these statements. They had the ability, and the duty, to promptly disseminate accurate and truthful information in the Registration Statement and to correct any statements that were materially misleading or untrue.

187. The Signer Defendants were also necessary in order to amend Firefly's governance documents, register and issue the IPO shares, and take other actions to effectuate the Registration Statement and complete the IPO, and thus controlled Firefly, the IPO, and the issuing of the false and misleading Registration Statement.

188. Accordingly, each of the Signer Defendants is liable as a controlling person of Firefly and the false and misleading Registration Statement.

### B. The Executive Defendants' Control Over Firefly During the Class Period

189. During the Class Period, the Executive Defendants were directly involved in the management and day-to-day operations of Firefly, and were privy to and reviewed confidential proprietary information concerning Firefly, its business operations, and Alpha. As officers and controlling persons of Firefly, the Executive Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Firefly's operations, business, and Alpha. In addition, the Executive Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Firefly's publicly traded shares would be based upon truthful and accurate information. Each of them was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

190. In public filings with the SEC, Firefly represented that the CEO and CFO managed Firefly's day-to-day operations. For example, Firefly acknowledged in its proxy statement filed with the SEC: "Management is responsible for the day-to-day management of the risks facing our Company," which includes the Executive Defendants. In addition, its 2025 annual report Firefly stated that defendant Kim is the Chief Operating Decision Maker, who makes the operating decisions, assesses financial performance, allocates resources, determines investment opportunities related to product development, platform enhancements, and new technologies, and monitors budget versus actual results. Likewise, Firefly's bylaws gave the CFO all the powers "incident to the position of CFO" and the CFO (defendant Ma) was responsible for reporting the "operations of the Corporation" to the Board. And as Alpha's Chief Engineer, Garcia was responsible for the Alpha launch vehicle's design, manufacturing and integration.

191. Accordingly, each of the Executive Defendants is liable as a controlling person of Firefly during the Class Period.

**C. The Controlling VC Defendants' Control Over Firefly**

192. Throughout all relevant times, the Controlling VC Defendants controlled Firefly. Firefly's Registration Statement acknowledged that "AE Industrial Partners controls us." AE Industrial along with AeroEquity GP, LLC controlled the AEI Funds, and both entities were controlled by Greene and Rowe. Firefly stated that it was exempt from certain corporate governance requirements because it was considered a "controlled company" by NASDAQ's standards as well.

193. At the time the Registration Statement became effective, the Controlling VC Defendants had a 47.4% stake in Firefly and the Registration Statement reported that after the IPO they would continue to hold approximately 40.1% of the Company.

194. In addition, as long as the Controlling VC Defendants held 5% of Firefly (which they still own at the time of this filing), through their control of the "Investor Group", the Controlling VC Defendants had additional powers. They controlled more than 50% of the total voting power of Firefly's voting stock, and had the right to designate up to 55% percent of Firefly's Board. Indeed, Firefly stated in the Registration Statement:

> Even when AE Industrial Partners ceases to own shares of our common stock representing a majority of the total voting power, for so long as AE Industrial Partners continues to own a significant percentage of our common stock***, it will still be able to significantly influence or effectively control the composition of our board of directors and the approval of actions requiring stockholder approval through their voting power***. . . . AE Industrial Partners will be able to cause or prevent a change of control of our Company or a change in the composition of our board of directors, and could preclude any unsolicited acquisition of our Company.

195. The Controlling VC Defendants designated the five Controlled Directors, their employees, as five of the nine Board directors at the time of the IPO, including the Board Chairman, defendant Konert. Only the Controlling VC Defendants could choose these directors' successors.

The Controlling VC Defendants told the SEC and their own investors that in such circumstances these employees will act to influence control over management of the portfolio company.

196. Not only did the Controlling VC Defendants control Firefly's Board, they controlled each Board committee, with the Controlled Directors making up the majority of the Audit, Compensation, and Nominating and Corporate Governance Committees. Pursuant to NASDAQ rules, this arrangement was only possible because Firefly was a controlled company. Thus, the Controlling VC Defendants made all important decisions for Firefly, including the IPO, the contents of the Registration Statement, who else sat on the Board, the Company's growth strategy, responsibility over management, and director and officer compensation and bonuses, including those of the Signer and Executive Defendants.

197. Through the Controlled Directors, whom the Controlling VC Defendants placed on Firefly's Board, the Controlling VC Defendants were directly involved in the management and day-to-day operations of Firefly. The Controlling VC Defendants were privy to and reviewed confidential proprietary information concerning Firefly, its business operations, and Alpha. The Controlling VC Defendants told the SEC and their investors that they monitor their portfolio companies through significant ongoing interactions with the management teams and control of the company board of directors. Indeed, the Controlling VC Defendants had the special right to have one of their own non-Board designees attend any Board meeting, including any committee meetings, and receive any Board materials. And the Controlling VC Defendants told the SEC and their investors that they obtain material non-public information from their control of companies to help monitor their investments.

198. The Registration Statement also acknowledged that the Controlling VC Defendants controlled almost all aspects of the Company's business and operations: "***AE Industrial Partners***

***will have significant influence with respect to our management, business plans, and policies, including the appointment and removal of our officers***." Indeed, defendant Kim reported to AE Industrial employee, defendant Konert, and thus, the Controlling VC Defendants had the ability to and did control Firefly's CEO.

199. The Controlling VC Defendants each had a duty to ensure their Controlled Directors would promptly disseminate accurate and truthful information with respect to Firefly's operations, business, and Alpha. In addition, the Controlled VC Defendants each had a duty to ensure that their Controlled Directors correct any previously issued statements that had become materially misleading or untrue, so that the market price of Firefly's publicly traded shares would be based upon truthful and accurate information. Each of them were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

200. In addition, the Controlling VC Defendants were able to and did control the content of the Registration Statement and completion of the IPO. Without the Controlled VC Defendants' approval, and their Controlled Directors' signatures, authority and/or consents, the Registration Statement would not have been filed and the IPO would not have been completed. The Controlling VC Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged in the Registration Statement and approved or ratified these statements.

201. The Controlling VC Defendants' approval was also required in order to amend Firefly's governance documents, register and issue the IPO shares, and take other actions to effectuate the Registration Statement and complete the IPO, and thus they controlled Firefly, the IPO, and the issuing of the false and misleading Registration Statement.

202. Accordingly, each of the Controlling VC Defendants is liable as a controlling person of Firefly, and the false and misleading Registration Statement.

### D. The Controlling VC Defendants' Control Over their Representatives on Firefly's Board of Directors

203. As a condition of their investments in Firefly, the Controlling VC Defendants received the majority of Firefly's Board seats. The Controlling VC Defendants filled those seats with individuals they controlled, their employees and agents: Emerson, Konert, Braden, McAllister, and Lusczakoski. The Controlling VC Defendants exercised control over these Controlled Directors.

204. The Controlling VC Defendants had a duty of undivided loyalty and utmost good faith to their own funds' clients and investors, which required them to ensure that each decision made by their representatives concerning the management and operation of Firefly was made in the best interest of the AEI Funds. Indeed, the Controlling VC Defendants ensured that IPO would not take place unless Firefly's certificate of incorporation freed the Controlling VC Defendants from the duty to refrain from competing with Firefly and established that AE Industrial could not be liable for breach of any fiduciary duty arising from conflicts of interests. The Controlling VC Defendants ensured that they could control that Firefly's decisions were in their best interest (not solely Firefly's) by appointing their employees and agents to Firefly's Board.

205. The Controlling VC Defendants controlled the Controlled Directors through their employer/employee and agent/principal relationships and also by providing financial incentives to work in their interest. Each Controlled Director received a salary, bonuses, and/or other compensation from the Controlling VC Defendants. The Controlling VC Defendants explicitly and implicitly required that all material information shared with or learned by the Controlled Directors be shared with the Controlling VC Defendants. Indeed, it was because of these Controlled Directors that the Controlling VC Defendants had the inside information needed to assert significant influence

with respect to Firefly's management, business plans, and policies, as Firefly acknowledged in the Registration Statement.

206. The Controlled Directors lacked the authority to act in their capacity as Firefly Board members without approval from the Controlling VC Defendants. AE Industrial has a decision approval process utilizing various internal committees, such as the Valuation, Risk and Operations Committee, the Investment Committees and Advisory Committees, and operations teams to monitor Firefly and direct the Controlled Directors. At all times defendants Greene and Roe also retained veto power and control over all decisions. Each of the Controlled Directors would not have signed, or authorized the Registration Statement to be signed, consented in the Registration Statement to being named as about to become a director, or taken the other necessary steps to carry out the IPO without the approval of the Controlling VC Defendants.

207. Accordingly, each of the Controlling VC Defendants is liable as a controlling person of each Controlled Director, with each Controlled Director is alleged to be a primary violator of §11 of the Securities Act, and the false and misleading Registration Statement.

## XI. ALLEGATIONS OF *RESPONDEAT SUPERIOR* LIABILITY

208. The Controlling VC Defendants are vicariously liable as principals of their agents, Emerson, Konert, Braden, McAllister, and Lusczakoski, under the doctrine of *respondeat superior*. The conduct that makes these Controlled Directors liable under Plaintiffs' Securities Act claims occurred while they were employees or agents of the Controlling VC Defendants. Leading up to and throughout the IPO, the scope of the Controlling VC Defendants' employee-employer and agency relationships with these defendants included their directorships, managing Firefly, effecting the completion of the IPO, and signing or authorizing the signing of the Registration Statement or consents in the Registration Statement.

209. As employees of AE Industrial, the Controlled Directors acted as representatives of the Controlling VC Defendants by acting on their behalf. The Controlled Directors were each appointed to the Board in their capacity as agents of the Controlling VC Defendants. These Controlled Directors were required to share all information they learned and discuss issues with their principals and negotiate with or instruct Firefly on behalf of the Controlling VC Defendants. The Controlling VC Defendants' decision to commence the IPO process, and filing of the Registration Statement and consents, was in line with Firefly's decision to proceed with an IPO because Firefly was quickly running out of funding, and the IPO proceeds would allow Firefly to continue to exist, repay loans, pay its preferred dividends, and ultimately allow for the Controlling VC Defendants to monetize their investment. Thus, it was in the best interest of the Controlling VC Defendants to have Firefly conduct the IPO.

210. The Controlled Directors were each motivated by a purpose to serve the Controlling VC Defendants. Each had incentives, including employment, relationship and reputational incentives, tied to the success of the Controlling VC Defendants' investment in Firefly.

211. Acting as Board members, controlling portfolio companies, and signing registration statements and consents were acts within the scope of the Controlled Directors' employment and/or agency. Each of these defendants served on multiple boards for the Controlling VC Defendants, protecting their investments and working toward the venture capital funds' exits at maximized rates of return.

212. In addition to Firefly, Emerson served as chairman of the Controlling VC Defendants' portfolio companies All.Space, and Spirent Federal Systems, and served on the boards of other Controlling VC Defendants portfolio companies Belcan, York Space Systems LLC, and The AtlasGroup.

213. In addition to Firefly, Konert served on the boards of the Controlling VC Defendants' portfolio companies Redwire, REDLattice, ThayerMahan, York Space Systems, BigBear.ai, Gryphon Technologies, American Pacific Corporation, Calca Solutions, and Belcan.

214. In addition to Firefly, Braden served on the board of the Controlling VC Defendants' portfolio companies BigBear.ai, REDLattice, and Belcan, and was the CEO of Controlling VC Defendants' portfolio company Gryphon Technologies.

215. In addition to Firefly, Lusczakoski served on the board of the Controlling VC Defendants' portfolio company Calca Solutions.

216. In addition to Firefly, McAllister served as chairman of the Controlling VC Defendants' portfolio company Belcan.

217. Accordingly, each of the Controlling VC Defendants is liable under the doctrine of *respondeat superior* for the acts within the scope of the Controlled Directors' employment and agency relationships that violated §11 of the Securities Act.

## XII. CLASS ACTION ALLEGATIONS

218. Plaintiffs bring this action as a class action on behalf of a class consisting of all persons who purchased Firefly common stock during the Class Period, including persons who purchased Firefly common stock traceable to the Registration Statement. Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

219. The Class Members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Firefly common stock was issued and actively traded on the NASDAQ. While the exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of

members in the proposed Class. Record owners and other Class Members may be identified from records maintained by Firefly or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

220. Plaintiffs' claims are typical of the claims of the Class Members, as all Class Members are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

221. Plaintiffs will fairly and adequately protect the interests of the Class Members and have retained counsel competent and experienced in class and securities litigation.

222. Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members. Among the questions of law and fact common to the Class are:

(a) whether the Registration Statement used in connection with the IPO was materially false and misleading;

(b) for the Exchange Act allegations only, whether Firefly and the Executive Defendants' statements during the Class Period were materially false and misleading;

(c) for the Exchange Act allegations only, whether Firefly and the Executive Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(d) the extent of injuries sustained by the Class Members and the appropriate measure of damages.

223. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### For Violation of §11 of the Securities Act
### (Against Firefly, the Signer Defendants, and the Underwriter Defendants)

224. Plaintiffs repeat and reallege the allegations contained in ¶¶1-97, 148-184, 208-223, as if fully set forth herein.

225. This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, against Firefly, the Signer Defendants, and the Underwriter Defendants on behalf of Plaintiffs and all other Class Members who purchased shares of Firefly common stock traceable to the Registration Statement. This claim is based on strict liability and does not sound in fraud. Plaintiffs expressly disavow and disclaim any allegations of fraud or intentional conduct as part of this Count.

226. As alleged above, the Registration Statement contained untrue statements of material facts or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. *See* §VI.A. Firefly, the Signer Defendants, and the Underwriter Defendants were responsible for the contents and dissemination of the Registration Statement.

227. Firefly is the registrant for the IPO. As issuer of the shares, Firefly is strictly liable to Plaintiffs and Class Members for the misstatements and omissions therein.

228. The Signer Defendants each signed the Registration Statement, were directors at the time the Registration Statement was declared effective, and/or were named in the Registration Statement, with their consent, as about to become a director and were each responsible for the contents of the Registration Statement.

229. The Underwriter Defendants are investment banks that specialize in underwriting public offerings of securities, and during the course of their purported due diligence prior to the IPO, the Underwriter Defendants had access to internal and confidential information concerning Firefly. The Underwriter Defendants collectively received more than $57.4 million for serving as underwriters of the IPO and, as alleged above, had other interests in ensuring a successful Firefly IPO.

230. By virtue of their employment and/or principal/agent relationship the Controlling VC Defendants as principals are liable under the doctrine of *respondeat superior*, for the actions of their respective employees and/or agents, Signer Defendants Emerson, Konert, Braden, McAllister, and Lusczakoski, who violated §11 of the Securities Act, 15 U.S.C. §77k, while acting within the scope of their employment and/or agency.

231. Plaintiffs and the Class purchased shares of Firefly common stock traceable to Registration Statement. *See* ECF 18-3; ECF 19-2. At the time of their purchases, and during the Class Period, all the shares available for trading were pursuant to the Registration Statement, which was filed and disseminated in connection with Firefly's IPO. All other common stock was not registered and restricted from being sold, based on multiple and overlapping regulatory restrictions and other contractual barriers, including SEC Rule 144, 17 C.F.R. §230.144, requirements concerning holding periods and affiliated persons, 180 day lock-up agreements, market standoff provisions and other private shareholder agreements with the Company, stop transfer instructions with the Company's transfer agent and registrar, and restrictive legends on stock certificates or associated with accounts. Thus, all of Plaintiffs' and the Class's Firefly common stock purchases are traceable to the Registration Statement.

232. Plaintiffs and the Class have sustained damages. The value of Firefly common stock declined substantially subsequent to and due to the false and misleading statements contained in the Registration Statement.

233. This claim is brought within the applicable statute of limitations.

234. By virtue of the foregoing, Firefly, the Signer Defendants, and the Underwriter Defendants violated §11 of the Securities Act, 15 U.S.C. §77k, and are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs.

**COUNT II**
**For Violation of §15 of the Securities Act**
**(Against the Signer Defendants and the Controlling VC Defendants)**

235. Plaintiffs repeat and reallege the allegations contained in ¶¶1-97, 148-188, 192-234, as if fully set forth herein.

236. This claim is brought on behalf of the Class pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against the Signer Defendants and Controlling VC Defendants. This claim is based on strict liability and does not sound in fraud. Plaintiffs expressly disavow and disclaim any allegations of fraud or intentional conduct as part of this Count.

237. As more fully described above, by virtue of their positions as directors and officers of Firefly, ownership or beneficial ownership, contracts, agreements, pattern of business conduct, employment and agency relationships, and through their management of Company employees, agents, policies, processes, procedures and other specific acts, the Signer Defendants and the Controlling VC Defendants, at the time of the wrongs alleged herein and as set forth herein, were controlling persons of Firefly within the meaning of §15 of the Securities Act, 15 U.S.C. §77o. The Signer Defendants and the Controlling VC Defendants had the power and influence over Firefly, including the direction of its management and policies, the ability to control the IPO and the contents of the Registration Statement, and caused Firefly to engage in the acts described herein.

238. As more fully described above, the Controlling VC Defendants, by virtue of their employment relationships, agency relationships, incentives, and association with defendants Emerson, Konert, Braden, McAllister, and Lusczakoski, at the time of the wrongs alleged herein and as set forth herein, were controlling persons of these Controlled Directors within the meaning of §15 of the Securities Act, 15 U.S.C. §77o. The Controlling VC Defendants had the power and influence over the Controlled Directors, including directing their decisions on Firefly's Board, their signing or authorizing the signing of the Registration Statement, and/or consenting to being about to become a Firefly director in the Registration Statement, the ability to control the IPO and the contents of the Registration Statement, and caused the Controlled Directors, who are each primary violators of §11 of the Securities Act, 15 U.S.C. §77k, to engage in the acts described herein.

239. By virtue of their employment and/or principal/agent relationship, the Controlling VC Defendants as employers and/or principals are liable under the doctrine of *respondeat superior*, for the actions of each of their employees and/or agents, defendants Emerson, Konert, Braden, McAllister, and Lusczakoski, who violated §15 of the Securities Act, 15 U.S.C. §77o, while acting within the scope of their employment and/or agency.

240. As a result, the Signer Defendants and Controlling VC Defendants were control persons within the meaning of §15 of the Securities Act, 15 U.S.C. §77o.

241. This claim is brought within the applicable statute of limitations.

242. By virtue of the foregoing, the Signer Defendants and Controlling VC Defendants violated §15 of the Securities Act, 15 U.S.C. §77o, and are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs.

## COUNT III
## For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Against Firefly and the Executive Defendants)

243. Plaintiffs repeat and reallege the allegations contained in ¶¶1-78, 98-184, 208-223, as if fully set forth herein.

244. This Count is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.105b-5, against Firefly and the Executive Defendants.

245. During the Class Period, Firefly and the Executive Defendants deceived the investing public, including Plaintiffs and the Class, and artificially inflated or artificially maintained the price of Firefly common stock.

246. As described above, Firefly and the Executive Defendants made untrue statements of material fact and/or omitted material facts necessary to make their statements made not misleading. They had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth.

247. Firefly and the Executive Defendants violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b) and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Firefly common stock during the Class Period.

248. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Firefly common stock. Plaintiffs and the Class would not have purchased Firefly common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' false and misleading statements and omissions.

249. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other Class Members suffered damages in connection with their purchases of Firefly common stock during the Class Period.

250. This claim is brought within the applicable statute of limitations.

251. By virtue of the foregoing, Firefly and the Executive Defendants violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs.

**COUNT IV**
**For Violation of §20(a) of the Exchange Act**
**(Against the Executive Defendants and the Controlling VC Defendants)**

252. Plaintiffs repeat and reallege the allegations contained in ¶¶1-78, 98-184, 189-223, 243-251, as if fully set forth herein.

253. This Count is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a) against the Executive Defendants and Controlling VC Defendants.

254. As more fully described above, by virtue of their positions as officers of Firefly ownership or beneficial ownership, contracts, agreements, pattern of business conduct, employment and agency relationships, and through their management of Company employees, agents, policies, processes, procedures and other specific acts, the Executive Defendants and the Controlling VC Defendants, at the time of the wrongs alleged herein and as set forth herein, were controlling persons of Firefly within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a). The Executive

Defendants and the Controlling VC Defendants had the power and influence over Firefly, including the direction of its management and policies, the ability to control Firefly's false and misleading statements alleged herein during the Class Period, and caused Firefly to engage in the acts described herein.

255. As a result, the Executive Defendants and the Controlling VC Defendants were control persons within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

256. This claim is brought within the applicable statute of limitations.

257. By virtue of the foregoing, the Executive Defendants and the Controlling VC Defendants violated §20(a) of the Exchange Act, 15 U.S.C. §78t(a), and are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' acts and transactions, as control persons, or principals or employers under the doctrine of *respondeat superior*, in an amount to be proven at trial;

C. Awarding Plaintiffs and the Class prejudgment and post-judgment interest, as well as costs and expenses, including attorneys' fees, expert fees, and other costs and disbursements; and

D. Awarding such other relief, including disgorgement, rescission and any injunctive relief this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: May 29, 2026

ROBBINS GELLER RUDMAN & DOWD LLP
PATTON L. JOHNSON (admitted *pro hac vice*)
JOHN M. KELLEY (admitted *pro hac vice*)

s/ Patton L. Johnson
PATTON L. JOHNSON

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
pjohnson@rgrdlaw.com
jkelley@rgrdlaw.com

*Counsel for Prakash Vasudeva Bhat and Co-Lead Counsel for the Class*

KENDALL LAW GROUP, PLLC
JOE KENDALL
Texas Bar No. 11260700
3811 Turtle Creek Blvd., Suite 825
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

*Local Counsel for Prakash Vasudeva Bhat and Co-Liaison Counsel for the Class*

SPONSEL MILLER PLLC
THANE TYLER SPONSEL III
State Bar No. 08390000
Federal I.D. No. 3932
520 Post Oak Boulevard, Suite 310
Houston, TX 77027
Telephone: 713/892-5400
713/892-5401 (fax)
sponsel@smglawgroup.com

*Liaison Counsel for Julian Petroulas and Co-Liaison Counsel for the Class*

LEVI & KORSINSKY, LLP
SHANNON L HOPKINS (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: 203/992-4523
212/363-7171 (fax)
shopkins@zlk.com
gpotrepka@zlk.com

*Counsel for Julian Petroulas and Co-Lead Counsel for the Class*